U.S. District Court of
Southern District of New york.

# 13 CV 4816

Mustafa Ozsusamlar
Plaintiff
-V-

B. Alan Seidler.

Alexander H. Southwell.

John F. Campanella.

Mark Leeper.

## Complaint.
Civil Action. NO:

## I-Jurisdiction And venue.

1- I mustafa Ozsusamlar. this is a civil action authorized by 42. U.S.C. Section 1983 To redress of the deprivation. under color of state law. of Rights secured by the Constitution of the united states. the Court has jurisdiction under 28. U.S.C. section 1331 and 1343 (a)(3). Plaintiff Ozsusamlar seeks declaratory relief pursuant to 28. U.S.C. Section 2201 and 2202. plaintiff Ozsusamlar claims for inqunctive releif are Authorized by 28. U.S.C. Section 2283 and 2284 and Rule. 65. of the federal rules of Civil procedure.

2. This Civil action under 28. U.S.C. 1350 (2)(b) and 28. U.S.C. 1350 (2). the District Court shal decline to hear a claim under this section. and statue of limitation. 10. years.

3. The action mr Saidler et all knowingly willfully Cooperated for against to plaintiff Violating U.S.C. Right about fabricating improper infuluencess and motivecation. under Oath given knowingly perjury testimony. and Hearsay testimony. Violating. 28. U.S.C. 801. A and 28. U.S.C. 801. (1)(B) And testimony is offered to rebot an Express or impilent Charge against the declarant of recent fabrication infuluence or motive.

4- 28. U.S.C. 803 (8)(A) and 803 (B) and 803. C). this Complaint by plaintiff Ozsusamlar Recent Civil action and proceedings and against the goverment in criminal cases. Factual finding resulting from an investigation made pursuant to authority granted by law.

5. The Southern District of New york is on apprupriate venue under 28. U.S.C. Section 1391 (b)(2). because it is where the events giving to this claim occurred.

## II-Plaintiff.

6 Plaintiff Ozsusamlar, is prison under violation U.S. Constitutional rights by the Coopereted Deffendants. without violating Rule of Justice correctly custody FCI. Fairtion New Jersey. Department of Correction.

Pg-1-

CLOSED, ECF, RELATED

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:04-cv-05944-KMW
### Internal Use Only

United States of America v. $3,700.00 in United States Currency

Assigned to: Judge Kimba M. Wood

Related Case: 1:02-cr-00763-KMW-1

Cause: 18:981 Civil Forfeiture

Date Filed: 07/30/2004

Date Terminated: 08/23/2005

Jury Demand: None

Nature of Suit: 690 Forfeit/Penalty: Other

Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**United States of America**                    represented by **David Noel Kelley**

U.S. Attorney's Office, SDNY (St Andw's)

One St. Andrew's Plaza

New York, NY 10007

(212) 701-3050

Fax: (212) 269-5420

Email: david.kelley@usdoj.gov

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**$3,700.00 in United States Currency**        represented by **Bernard Alan Seidler**

B. Alan Seidler, Esq.

580 Broadway

New York, NY 10012

(212)-334-3131

Fax: (212)-334-2211

Email: snedens66@aol.com

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/30/2004 | 1 | COMPLAINT against $3,700.00 in United States Currency. Document filed by United States of America.(jjm, ) Additional attachment(s) added on 8/4/2004 (jjm, ). (Entered: 08/02/2004) |

45apozs2                          Souvorkine - direct

1           (In open court; jury present).

2           THE COURT:  Mr. Souvorkine, I remind you that you are

3    still under oath.

4    CROSS-EXAMINATION

5    BY MR. SEIDLER:

6    Q.  Mr. Souvorkine, in the beginning of your testimony, you

7    said that you were told that Refik and somebody named Mustafa

8    were partners?

9    A.  No, nobody said that word to me that they were partners.

10   When Iouri was trying to reach Mustafa, it happened that he

11   spoke to Refik.  And the only thing that Iouri said to me was

12   that they were working together.

13   Q.  What number did Iouri dial when he was trying to reach this

14   person named Mustafa?

15   A.  I don't know that number because he was dialing it on his

16   cellar phone.

17   Q.  Were you ever given a last name for Mustafa?

18   A.  No.

19   Q.  Were you ever given a telephone number for Mustafa?

20   A.  No.

21   Q.  Did you ever meet Mustafa?

22   A.  No.

23   Q.  Have you heard any recorded telephone or other conversation

24   in which the name Mustafa is mentioned?

25   A.  No.

45apozs4                    Campanella - cross

*PATEC*

1    down, your Honor?

2         THE COURT:  Yes.

3    Q.  Did you ever make an effort to ascertain what you have to

4    do to rent a van from Budget?

5    A.  No, I did not.

6    Q.  When Mr. Ozsusamlar was arrested, how many pieces of

7    identification in names other than his, did you find in his

8    car?

9    A.  We had -- in his car was another set of identification.

10   The car was registered to another individual:  Oscane -- Ozcar

11   Ozoglu.

12   Q.  Where did you find the Rafet Gozel identification document?

13   A.  I retrieved that from New York State Department of Motor

14   Vehicles under a subpoena.

15   Q.  What about Mustafa Ozsusamlar's DMV application, where did

16   you retrieve that?

17   A.  From the New York State Department of Motor Vehicles.

18   Q.  Do you know whether or not motor vehicles ever acted upon

19   the application?

20   A.  A license was issued.

21   Q.  To whom?

22   A.  Ozcan and Gozel.  Gozel was denied because the Social

23   Security card was fraudulent.  But Ozcan was issued.

24   Q.  Could you take an out-of-state driver's license to Budget

25   to rent a van?

*EX.M.A*

1   A.  26 years.  23 years as a special agent.

2   Q.  What is your educational back ground, Agent Campanella?

3   A.  I have a history degree and an accounting degree.

4   Q.  You mentioned the types of cases that your squad focuses

5   on.  What generally do you focus on in your investigations?

6   A.  I am the case agent of an ongoing Group One undercover

7   operation in New York office.

8   Q.  What generally does that entail?

9   A.  I meet with FBI undercover agents, cooperating witnesses.

10  I debrief both FBI undercover agents and cooperating witnesses

11  and I furnish them with anything they may need to conduct

12  undercover scenarios against targets.

13  Q.  You mentioned a word "Group One," what does that mean?

14  A.  Group One is a full fledged undercover operation which is

15  approved simiannually by the Department of Justice in

16  Washington DC.

17  Q.  Now, Agent Campanella, during your career with the FBI, how

18  many arrests have you participated in?

19  A.  Well over a thousand.

20  Q.  Did there come a time when you got involved with an

21  investigation related to Mustafa Ozsusamlar?

22  A.  Yes, in March of 2002.

23  Q.  How did that come about?

24  A.  I had been meeting with a cooperating witness Igor

25  Souvorkine who advised me of his relationship.

45A6OZS3                        Campanella - direct

1          MR. SEIDLER:  Objection.

2          THE COURT:  Sorry?

3          MR. SEIDLER:  I object, your Honor.

4          MR. SOUTHWELL:  If I could rephrase the question, your

5     Honor.

6          THE COURT:  Yes.

7     BY MR. SOUTHWELL:

8     Q.  Without telling us what Mr. Souvorkine specifically told

9     you, how did you come to be involved with the investigation

10    related to Mr. Ozsusamlar?

11         THE COURT:  I will strike the last answer?

12    A.  I had information regarding the sale of Washington DC

13    driver's licenses.

14    Q.  And what did you do with that information generally

15    speaking?

16    A.  I started an undercover operation involving Mr. Souvorkine,

17    placing a body recording device on him for meets with Iouri

18    Bobik, Rafet Ozoglu and others.

19    Q.  Based on your supervision of the activities of

20    Mr. Souvorkine, did you take any action?

21    A.  Yes.  On May 23, 2002, I obtained four arrest warrants for

22    Iouri Bobik, Gwendolynn Dean, Rafet Ozoglu and another

23    individual.

24    Q.  Now, Agent Campanella, were you on duty on June 4, 2002?

25    A.  Yes, I was.

Page 349

(In open court.)

Q: You testified on direct examination, you had lists of
[3] clients that you referred to Rafet and Ozsusamlar, is that
[4] correct?

[5] A: Yes.

[6] Q: And you received payments from those clients directly?

[7] A: That's correct.

[8] Q: And you sent faxes to Ozsusamlar concerning these illegal
[9] activities as you described them?

[10] A: That's correct.

[11] Q: Do you have any financial paper records of any of the
[12] transactions that you described?

[13] A: No. I would never give any receipts to my customers, and I
[14] would always receive cash.

[15] Q: What about the faxes that you sent to Ozsusamlar, do you
[16] have any copies of those faxes?

[17] A: I think I have submitted copies of one or two to the FBI
[18] agent.

[19] Q: When was that?

[20] A: Right after I was released from jail, I had found these
[21] among the documents in the office and I have given them to —

[22] Q: Have you ever paid United States taxes on the money that
[23] you earned from your businesses?

[24] A: No.

[25] Q: Has anybody ever asked you to do that?

Page 350

[1] A: I knew I had to pay, but I didn't have any status and work
[2] authorization so I didn't pay.

[3] Q: What about since you began cooperating with the government,
[4] has anybody asked you to start paying taxes this money?

[5] A: I never had any conversations regarding this matter with
[6] anyone.

[7] Q: So you came into the United States illegally, correct?

[8] A: Correct.

[9] Q: When you were in the United States, you committed crimes in
[10] the year 2001 and 2002?

[11] A: Yes.

[12] Q: And in the year 2000, correct?

[13] A: Yes.

[14] Q: You were arrested and thrown in jail on this case?

[15] A: Correct.

[16] Q: How much time did you spend in jail before you were
[17] released?

[18] A: Approximately four months.

[19] Q: Have you been back to jail since then?

[20] A: No.

[21] Q: Do you recall what month you were released from jail?

[22] A: I was arrested in October of 2002, and I was released four
[23] months after that. I don't remember the exact time.

[24] Q: And you paid no federal income taxes?

[25] A: No.

Page 3

[1] Q: And it is fair to say that you pay no state or city income
[2] taxes?

[3] A: No.

[4] Q: You have now a cooperation agreement that you hope will
[5] keep you out of jail?

[6] A: Yes.

[7] Q: And you have a promise from the government to get you an S1
[8] visa so that you can stay in the United States as long as your
[9] agreement lasts?

[10] A: We had a conversation like this and it was said that they
[11] are going to make out and send an application for this, but I
[12] am not sure whether I will get this or not.

[13] Q: It was more than said to you, wasn't it? They told you
[14] that — the prosecutors told you that they would make an
[15] application with the State Department to obtain for you, if
[16] they could, an S1 visa to permit you to remain in the United
[17] States?

[18] A: What they told me is that they will only make the
[19] application, and the decision will be made by the State
[20] Department so, as far as I know, they don't know and I don't
[21] know whether if this visa will be granted or not.

[22] Q: Well, what is your expectation if one branch of the
[23] government says that they are going to intercede on your behalf
[24] with another branch. What do you think is going to happen, in
[25] your mind?

Page 35

[1] INTERPRETER ESENDAL: May I have this again?

[2] Q: What do you think is going to happen when one branch of the
[3] government says they are going to intercede on your behalf with
[4] another branch to acquire some benefit for you?

[5] THE COURT: The witness should pause so that you can
[6] interpret.

[7] A: I really don't know what is going to happen, and from the
[8] things that I have read and heard, it may be fair to say that I
[9] may not be able to get this. That's why I have the impression.

[10] Q: And it may be fair to say that you will get it, correct?

[11] A: Correct.

[12] Q: And is it fair to say that at least the executive branch of
[13] the government is going to help you try to get it?

[14] A: As long as the agreement lasts, yes.

[15] Q: How many times did you meet Mr. Ozsusamlar, in total?

[16] A: As far as I can remember, only two times.

[17] Q: The second meeting was at the Cheyenne Diner in New York
[18] City?

[19] A: I don't know the name of the diner, but I met him at the
[20] diner in the corner of Ninth Avenue and 33rd Street.

[21] Q: How many meetings prior to today did you have with the
[22] government in preparation for this case?

[23] A: Approximately four or five times we sat down together. I
[24] don't know the exact count.

[25] Q: At what if any meetings did you mention that you had this

ʳ⁻ᵃˡ Volume 3
6, 2004

UNITED STATES OF AMEᴵ
MUSTAFA OZSUᵼ

Page 353

| meeting with Ozsusamlar at the diner on 33rd Street?

| INTERPRETER ESENDAL: I'm sorry.

| Q: At any meetings with the government, did you mention that
| you had had this meeting with Ozsusamlar on 33rd Street in
| Manhattan?

| A: Yes.

| Q: Which meeting or meetings?

| A: In a couple of meetings I would say because, in those
| meetings, they were trying to find out what I knew about all
| these things, subjects so I would say it must be in a couple of
| meetings.

| Q: Do you have a recollection of that or are you just
| guessing?

| A: I know I spoke about this matter, but I cannot say in which
| meeting and how many times.

| Q: Do you remember who was present when you spoke about it?

| A: I remember that.

| Q: Who was present?

| A: Prosecutor Alexander Southwell, Agent Jack Campanella, and
| a couple of times David — I don't remember the last name —
| and then Seigal — David Seigal, yes.

| Q: Was anybody writing down what you were saying, did you
| notice, when you were talking about the meeting on 33rd Street?

| A: Yes. Sometimes notes were taken, yes.

| Q: And do you remember who was taking the notes?

Page 354

| A: I didn't pay attention. Both sides, maybe.

| Q: Did Rafi, when you were committing these crimes with Rafi,
| did he live in your apartment building?

| A: In the building, yes.

| Q: And that's where you knew him from, correct?

| A: No. We had met before, before he rented an apartment in
| that building.

| Q: Why did he move into your apartment building, if you know?

| A: He was looking for an apartment with his girlfriend, and I
| had a manager friend so he came to me and I helped him.

| Q: Did you consider Rafi to be a friend of yours?

| A: We cannot say friends, no. We can say business friends.

| Q: Did you ever have any fee disputes with Rafi?

| INTERPRETER ESENDAL: Fee?

| MR. SEIDLER: F-E-E.

| A: A couple of times, yes, we had arguments.

| Q: Were you and he alone when you had those arguments?

| A: Yes.

| Q: Were those problems resolved in a friendly way?

| A: Yes.

| Q: In the criminal case for which you were arrested, were you
| represented by an attorney?

| A: Yes.

| Q: Did you sign, along with your cooperation agreement, an
| agreement that you could meet with the prosecutors without your

Pa ...

[1] attorney being present?

[2] A: I remember signing an agreement like this, but I am not

[3] sure whether it was included in this agreement or whether it

[4] was a separate agreement.

[5] Q: Well, how many agreements did you sign?

[6] A: I think, two. One only, but I remember the other being

[7] like they can have meetings with me without my lawyer

[8] present — I don't exactly remember.

[9] Q: Let me show you what has been previously marked as

[10] Government Exhibit 3503-D. Would you look at it, sir?

[11] INTERPRETER ESENDAL: Your Honor, the witness wants me

[12] to read this to him.

[13] THE COURT: Any objection?

[14] MR. SEIDLER: No, your Honor.

[15] THE COURT: Yes. You may read it to him.

[16] (Interpreter reading)

[17] A: Yes, I remember this.

[18] Q: You signed it?

[19] A: Yes.

[20] Q: How many meetings did you have with the agents without your

[21] attorney being there?

[22] MR. SOUTHWELL: Objection. Just narrow the scope.

[23] Q: After you were released from jail, how many meetings did

[24] you have with the agents without your attorney being there?

[25] THE COURT: In connection with this case?

Page 356

[1] MR. SEIDLER: This particular case.

[2] THE WITNESS: What case? Regarding to what case? I

[3] didn't understand.

[4] Q: The case, the reason that you are here.

[5] A: I didn't understand the question. May I have the question

[6] again, please?

[7] Q: How many meetings did you have with the agents assigned to

[8] this case regarding this case at which your attorney was not

[9] present?

[10] A: A couple of times we had meetings and once I had a meeting

[11] with them where I gave a copy of that fax that I had found and

[12] a couple of times I don't know.

[13] Q: When you gave the fax over, was your attorney present?

[14] A: No.

[15] Q: I'm trying to narrow this down more specifically than a

[16] couple of times. Was it more than two, more than three, was it

[17] less than five?

[18] A: We can say more than three, more than five.

[19] Q: More than five?

[20] A: Yes.

[21] Q: How many meetings did you have with the agents concerning

[22] this case at which your attorney was present?

[23] A: In what time frame, may I ask? Is it during the time when

[24] I was incarcerated because when I was incarcerated we had

[25] meetings like four or five times when my lawyer was present

STATES OF AMERICA   v.
FA OZSUSAMLAR

Trial Volume
May 6, 20

Page 357

[1] also.

[2] Q: Of the total number of meetings that you had with the

[3] agents after you were arrested, how many times was your

[4] attorney present?

[5] A: Two or three times.

[6] Q: And how many times was he not present, in total?

[7] A: Let's say five or six times.

[8] Q: When you came to the United States, did you bring family

[9] with you?

[10] A: No.

[11] Q: Do you have family now?

[12] A: Yes, I do have, but they are not here.

[13] Q: By "here" you mean in the United States?

[14] A: Yes. They are not in the United States.

[15] Q: When you knew this man, what did you know him by, what

[16] name?

[17] A: Rafet.

[18] Q: Did you ever call him Rafi?

[19] A: Yeah.

[20] Q: Do you know a man named Rafi who was not Rafet?

[21] A: I was using that as an abbreviation. I don't have anybody

[22] else.

[23] MR. SEIDLER: I have nothing else.

[24] THE COURT: We can either have the government finish

[25] up if you have questions or we can take a break.

Page 358

[1] MR. SOUTHWELL: If we could take a short break, we

[2] don't have very much more to go.

[3] THE COURT: This then will be our afternoon break, ten

[4] minutes.

[5] Thank you.

[6]

[7] (Continued on next page)

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[1] (Jury not present)

[2] THE COURT: Do counsel wish to raise anything or are

[3] we on a break?

[4] MR. SEIDLER: This issue I would like to explore.

[5] THE COURT: I think that the witness should step

[6] outside one of the witness rooms.

[7] (Witness excused)

[8] MR. SOUTHWELL: Your Honor, it is somewhat of a

[9] delicate issue. I believe what defense counsel wants to do is

[10] inquire of the witness about an ad for immigration consulting

[11] service which is in fact the witness's business. He has a

[12] legitimate business, but it is also —

[13] THE COURT: I may not —

[14] MR. SOUTHWELL: It is the issue that we raised

[15] previously with your Honor. To avoid any confusion about the

[16] issue, I thought that we had already crossed this bridge with

[17] Mr. Seidler. And it may be that we —

[18] THE COURT: I think that the way we left it was that

[19] we would take it up when the jury was not being held up, so I

[20] will give Mr. Seidler whatever time he wants.

[21] MR. SEIDLER: This ad came to me apart from the

[22] government. I was told that he was involved in ongoing

[23] operations, but whether or not he was still operating in

[24] business of a like nature, that had nothing to do with his

[25] operations, I had no way of knowing. This was provided to me

Page 36

[1] by Mr. Ozsusamlar as a similar address to a document that had

[2] been provided in discovery.

[3] So I don't really think it is improper. If he has a

[4] financial interest in this company and he is still operating a

[5] like type company, if this is part of his cooperation and this

[6] is under government control, I am not going to get into it.

[7] But if there are other things going on here, I think that I

[8] have a right to inquire, and I don't know what is going on

[9] here.

[10] MR. SOUTHWELL: Your Honor, I can proffer for the

[11] record and Agent Campanella can further explain, Mr. Sezer does

[12] run an immigration consulting business, and they are out of a

[13] location where other investigatory activities are conducted.

[14] THE COURT: If that is the case, it is fairly simple.

[15] The question could be limited to the commercial work that this

[16] defendant does that excludes what we talked about at sidebar.

[17] MR. SOUTHWELL: It is all legitimate work.

[18] My concern is that, to the extent defense counsel

[19] wants to leave any implicit argument with the jury about the

[20] nature of his current business as it relates to prior business,

[21] we don't have an ability to respond to that because of the

[22] ongoing nature of things.

[23] THE COURT: Even if it were not for that, he might

[24] well be in the immigration business and might well be doing so

[25] legitimately or not. In other words, if the witness is

l Volume 3
⌐y 6, 2004

UNITED STATES OF AMER
MUSTAFA OZSUSA.

---

Page 361

correctly prepared and if the questions are framed narrowly enough, nothing damaging will come out.

MR. SOUTHWELL: May I have a moment with Mr. Seidler?

THE COURT: Yes. Certainly.

(Discussion off the record among counsel)

THE COURT: Why don't we bring the witness in if you need answers to anything.

MR. SOUTHWELL: If I could just have a moment with Agent Campanella.

THE COURT: Sure.

INTERPRETER YUCEL-KAY: Can the interpreter help the defendant to talk to Mr. Seidler?

THE COURT: We have an abundance of interpreters, which we don't usually have, so I will allow you to do that while we have an abundance.

MR. SOUTHWELL: Your Honor, the answer is that it is a front. There is a very small amount of ancillary business to keep up appearances but, beyond that, it is a front.

THE COURT: So given that, Mr. Seidler, what is your intention?

MR. SEIDLER: Is the ancillary business in order to maintain the front?

All that I want to get at, is this another part of the deal where he is allowed to make money doing this while he is here and cooperating in other matters?

---

Page 362

THE COURT: How ancillary? How big?

MR. SOUTHWELL: It is a small ancillary business. He is allowed to keep approximately $100 a week that he makes from that ancillary business which is perfectly legitimate.

MR. SEIDLER: Can I ask him as well, his agreement with the government concerning cooperation is that he is, in effect, getting paid $100 a week for his services —

THE COURT: — by clients. What I heard was by clients.

MR. SEIDLER: By clients, but only because the government is allowing him to operate his business. If he is out on bail, there is no way that he could be operating this business.

THE COURT: I really don't know what you want to elicit from the witness that is probative of anything here.

MR. SEIDLER: He says that they are going to write him a 5K1 letter, help him with an S1 visa and directly or indirectly he is receiving compensation while he is cooperating.

THE COURT: He is being allowed to work a bit and to keep the earnings from that work.

MR. SEIDLER: I think that is work that he couldn't possibly be doing.

THE COURT: I don't misunderstand you. I am just trying to figure out how to narrowly allow it.

---

Page 363

[1] MR. SOUTHWELL: We already did elicit that the work
[2] authorization is an additional benefit.
[3] THE COURT: How about: Are you now benefiting from
[4] the work authorization?
[5] Yes. I am allowed to work a certain amount, and I
[6] earn about $100 a week from it.
[7] MR. SOUTHWELL: Since this has become an issue, that I
[8] be allowed on redirect to ask whether he is also engaged in
[9] ongoing investigations because we objected to something and the
[10] jury is going to be wondering what we are hiding from them.
[11] THE COURT: Defense counsel may or may not want that
[12] in the record. It is another possible benefit.
[13] MR. SEIDLER: That also opens up another whole — I am
[14] agreeing that I am not going to ask him about his cooperation
[15] activities, but I think that is a two-way street in other
[16] cases.
[17] THE COURT: I agree, unless there is something in the
[18] record that really needs correction.
[19] Is there a place that you were cut off, Mr. Southwell?
[20] MR. SOUTHWELL: No. The concern was the fact of Mr.
[21] Seidler asking questions about his current business, and our
[22] objection and the sidebar and the impression left with the jury
[23] was that we were hiding something about Mr. Sezer's background.
[24] THE COURT: There have been so many sidebars in this
[25] case, I don't think that they actually know what is going on at

---

Page 364

[1] sidebar. I don't think that that is important enough to
[2] require correction.
[3] I do think, however, that the witness needs to be told
[4] that he is not going to be asked to go into his other
[5] activities. And if you want to do it here on the stand, we can
[6] or, if Mr. Seidler OKs Mr. Southwell talking directly to the
[7] witness.
[8] MR. SEIDLER: Mr. Southwell can talk to him. I have
[9] no problem with that. I am going to ask him if he has
[10] authorization from the government to earn money while he is
[11] released from jail.
[12] MR. SOUTHWELL: OK.
[13] THE COURT: So everyone needs a break. We will be on
[14] a break until 3:30.
[15] (Recess)
[16] MR. SOUTHWELL: Judge, after Mr. Seidler asks his
[17] question, I alerted him, as a result of him asking a line of
[18] questions that the witness is getting some benefits, I will go
[19] into it on redirect, as well as the agreement to waive the
[20] presence of counsel, one paragraph, so that the jury can
[21] understand that as well.
[22] THE COURT: I have been going through the transcript
[23] trying to find something that you can answer for me much more
[24] quickly. Has the government decided definitively not to offer
[25] any INS decisions?

---

ΛES OF AMERICA   v.

OZSUSAMLAR

Trial Volum

May 6, 2(

---

Page 365

[1]     MR. SIEGAL: We have made that final decision, and we

[2] decided and we withdraw those exhibits that I mentioned this

[3] morning from what we have moved in evidence.

[4]     THE COURT: I found much to my embarrassment that

[5] 803(8) actually addresses it and says that that type of finding

[6] is admissible in a civil action but in a criminal action only

[7] against the government.

[8]     I don't know how I spent our time looking at cases

[9] when the rule is clear but now we know.

[10]    I think that we are ready to have the jury come in.

[11]    MR. SIEGAL: We are going to go back to Special Agent

[12] Leeper after this witness, just for that one purpose.

[13]    THE COURT: Sure.

[14]

[15]    (Continued on next page)

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 366

[1]    (Jury present)

[2]     THE COURT: Members of the jury, sometimes we take a

[3] much longer break than I told you that we were going to. What

[4] we are doing during that time is often whittling down the time

[5] that the trial will take. So I don't want you to feel that

[6] your time is wasted. It is quite usefully spent.

[7]     All right. We are ready to proceed.

[8] CROSS-EXAMINATION (Continued)

[9]     BY MR. SEIDLER:

[10]    Q: Mr. Sezer, after you were released from jail at some point,

[11] did you receive authorization from the government to earn money

[12] from legitimate sources while you were cooperating?

[13]    A: Yes.

[14]    Q: And from that money were you told you have to declare and

[15] pay income tax on it?

[16]    A: I didn't have any conversations related to this matter with

[17] anyone.

[18]    Q: When you went from Turkey to Russia before you came to the

[19] United States, what year was that?

[20]    A: 1997.

[21]    Q: How long did you remain in Russia before you went to

[22] Portugal?

[23]    A: Two and a half to three years, approximately.

[24]    Q: Why did you move from Turkey to Russia?

[25]    A: To continue on my university education in Russia and to do

---

Page 3

[1] business.

[2]     Q: What kind of business were you doing in Russia?

[3]     A: My family owned a leather business in Turkey, and I had

[4] gone to Russia to improve their wholesale sales in Russia.

[5]     Q: Since the time that you have been released from jail in

[6] this case, have you sent any money to Rafet?

[7]     INTERPRETER ESENDAL: I misunderstood.

[8]     A: Yes.

[9]     Q: How much money did you send to Rafet?

[10]    INTERPRETER YUCEL-KAY: Your Honor, Mr. Seidler should

[11] probably repeat his question again.

[12]    THE COURT: Could you please repeat your question?

[13]    Is it how much money did you send to Rafet?

[14]    INTERPRETER YUCEL-KAY: The one before that, your

[15] Honor.

[16]    BY MR. SEIDLER:

[17]    Q: Since you were released from jail on this case, have you

[18] sent money to Rafet?

[19]    A: No.

[20]    MR. SEIDLER: One second.

[21] I have nothing further. Thank you.

[22]    MR. SOUTHWELL: Very briefly, your Honor.

[23]    REDIRECT EXAMINATION

[24]    BY MR. SOUTHWELL:

[25]    Q: Mr. Sezer, you were asked a question on cross-examination

---

Page 36

[1] about whether you were authorized to earn money from legitimate

[2] sources while you were out cooperating. Approximately how much

[3] money do you make?

[4]     A: I am not making much money in the office, 100 to 200

[5] dollars per week.

[6]     Q: Is that from legitimate sources?

[7]     A: Yes.

[8]     Q: You were asked a question about a document that is marked

[9] for identification that should be in front of you, 3503D. I

[10] will show you what we have marked for identification as 3503D.

[11] You were asked a question about it on cross-examination?

[12]    A: Yes.

[13]    Q: What did you understand that agreement to be?

[14]    A: What I understand, when I sign this document, I agree to

[15] meet with the government agent and the government prosecutor

[16] without the presence of my lawyer.

[17]    Q: And that was in furtherance of your cooperation agreement,

[18] is that correct?

[19]    A: No. They had separately asked me a question about this

[20] subject and I had agreed to do that.

[21]    MR. SOUTHWELL: Your Honor, we offer 3503D.

[22]    THE COURT: Any objection?

[23]    MR. SEIDLER: No. I have no objection.

[24]    THE COURT: Government Exhibit 3503D is received

[25] without objection.

---

Page 369

(Government Exhibit 3503D received in evidence)

Q: What is the date of that agreement?

A: 2/5/03. That is what I read from here.

Q: I'm sorry. Is that 2/5/03?

A: Yes.

Q: That is just a one-paragraph agreement, is that right?

A: Yes.

Q: Do you have Government Exhibit 15 in front of you?

A: Yes.

Q: That is the cooperation agreement, is that right?

A: Yes.

Q: If you turn to the last page, what is the date on which you signed the cooperation agreement?

A: January 9, 2003.

INTERPRETER YUCEL-KAY: Can the interpreter approach?

THE COURT: You can actually have a conversation with the other interpreter.

(Discussion off the record between the interpreters)

INTERPRETER ESENDAL: My colleague has indicated to me that during the questioning, like five or six questions back, I may have made a mistake and the answer from Mr. Sezer was yes, but when it was asked again by Mr. Seidler upon her request, then the correct answer came as no.

THE COURT: This has to do with payment to Rafet?

INTERPRETER ESENDAL: Yes, sending money to Rafet.

Page 370

THE COURT: What was the mistake?

INTERPRETER YUCEL-KAY: In the first question prior to the mistake, it was answered as "yes." And I don't know if it should get into the record as a question and an answer or it should be removed.

THE COURT: I believe that everything that the jury has heard should be in the record and it will be in the record, and I leave it to the counsel and the witness to make any corrections they think necessary in front of the jury.

INTERPRETER YUCEL-KAY: I am sorry, but I just want to make sure that the witness understood that question prior to, 100 percent, and his response is 100 percent.

THE COURT: Mr. Southwell can do that. Thank you. What you are doing is very helpful.

MR. SOUTHWELL: I think it was simply a misunderstanding when he answered yes, so let me ask it again to be clear.

BY MR. SOUTHWELL:

Q: After you were released from prison, did you ever send any money to Rafet?

A: No.

(Continued on next page)

Page 371

[1]    MR. SOUTHWELL: I think it was.

[2]                  BY MR. SOUTHWELL:

[3]    Q: Now, turning back to the cooperation agreement, Government

[4]  Exhibit 15, if you will look next to the last page next to your

[5]  signature, what is the date that is written there?

[6]    A: 2-5-03.

[7]    Q: And what are your obligations under this agreement?

[8]    A: Not to commit anymore crimes, to tell the truth, and to

[9]  testify in court.

[10]   MR. SOUTHWELL: Your Honor, we move Exhibit 15 into

[11]  evidence.

[12]   MR. SEIDLER: I have a general objection to it.

[13]   THE COURT: All right. This is Government Exhibit

[14]  what?

[15]   MR. SOUTHWELL: 15.

[16]   THE COURT: All right. Just a moment. I will see you

[17]  at sidebar.

[18]   MR. SEIDLER: On cross-examination I didn't go into

[19]  the specifics of the agreement at all.

[20]   THE COURT: With which agreement?

[21]   MR. SEIDLER: The cooperation agreement. We raised

[22]  this before we begun.

[23]   MR. SEIDLER: I said, Yeah, fine, but that doesn't

[24]  mean I don't have an objection to it. I consent I have an

[25]  objection. I didn't go into it on cross-examination at all.

Page 372

[1]    THE COURT: I interpreted your silence as meaning no

[2]  objection, but that is water over the damn. Let's consider the

[3]  document now.

[4]    You went into the many benefits he got from the

[5]  government and it is only fair to present the complete

[6]  agreement so I overrule.

[7]    MR. SEIDLER: Okay.

[8]    (Continued on next page)

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

BY ...
Tran... ...
C... ...
...
not to be rep...

65CAAOZSH                    Hearing                                          1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              02 CR 763  (KMW)

5   MUSTAFA OZSUSAMLAR a/k/a
    "Mustafa Ozcan,",
6
                 Defendant.
7
    ------------------------------x
8
                                         New York, N.Y.
9                                        May 12, 2006
                                         12:30 p.m.
10

11  Before:

12                    HON. KIMBA M. WOOD,

13                                       District Judge

14
                         APPEARANCES
15
    JAMES B. COMEY
16       United States Attorney for the
         Southern District of New York
17  ALEXANDER SOUTHWELL
    DAVID SIEGAL
18       Assistant United States Attorney

19  B. ALAN SEIDLER
         Attorney for Defendant Ozsusamlar
20

21

22

23
    ALSO PRESENT:
24  A.J. ELTERMAN, Turkish Language Interpreter
    ASIYE YUCEL-KAY Turkish Language Interpreter
25

65CAAOZSH                    Hearing                                    2

1          (Case called)

2          THE COURT:  Good afternoon.  Please have a seat.

3          MR. SOUTHWELL:  Good afternoon, your Honor.

4      Alexander Southwell, with the government.

5          With me is also Assistant United States Attorney David

6      Seigel and Special Agent Jack Campanella.

7          MR. SIEDLER:  Alan Siedler, for Mr. Mustafa

8      Ozsusamlar.

9          THE COURT:  Good afternoon.

10         And good afternoon, Mr. Ozsusamlar.

11         We are here for a hearing at which I understand the

12     government will be presenting three witnesses.

13         MR. SOUTHWELL:  Yes, your Honor.

14         THE COURT:  And unless Mr. Siedler wishes to state

15     anything beforehand I'll just suggest that the government call

16     its witnesses.

17         MR. SIEDLER:  Well, actually I do.

18         There is a binder book before your Honor.  Government

19     Exhibit 10S is what I am talking about.

20         THE COURT:  10S as in Sam?

21         MR. SIEDLER:  Yes.

22         THE COURT:  I'm sorry.  I have 10 here.

23         MR. SIEDLER:  Then after that is 10S.

24         THE COURT:  I see.  Yes.

25         MR. SIEDLER:  That was a stipulation entered into two

3

65CAAOZSH                    Hearing

1    years ago concerning the business records, the applications and

2    items filled out by Gwendolyn Dean.  I am seeking to withdraw

3    from that stipulation for the purpose of this hearing for the

4    following reason and that is that for the last couple of months

5    we have attempted to obtain the employment records, the work

6    records of Gwendolyn Dean showing what hours she worked for the

7    Department of Motor Vehicles in Washington D.C.

8         Ultimately, the other day I received a transmission

9    from the District of Columbia Office of the Chief Financial

10   Officer for Monica Brown, Assistant General Counsel and is

11   seeking records from December 5 in particular.  And the bottom

12   line is they have no work records, no hourly work records for

13   Gwendolyn Dean for any period other than December 15, 2001.

14        So based on that I don't think it's reasonable to

15   stipulate that she was working on any days other than December

16   15, 2001.  I advised Mr. Southwell of this I think Wednesday

17   evening when I received the submission from Ms. Brown but that

18   is our position.  And I noticed going through the book, the

19   exhibit book yesterday that there are a whole host of records

20   and exhibits pertaining to the work product of Ms. Dean, so

21   it's my request that the government either produce Ms. Dean to

22   authenticate the records or authenticate them some other way

23   besides the stipulation.

24        THE COURT:  Well, I understand.  Yes.

25        MR. SOUTHWELL:  Well, your Honor, these records are

65CAAOZSH                    Hearing

1    all in evidence from the trial.  So all we are doing with

2    respect to having this binder put together is a convenient

3    package of exhibits that are already in evidence.  So as an

4    initial matter I don't think that defendant or defense counsel

5    can withdraw from a stipulation previously entered into in

6    evidence.

7            As another matter, the stipulation is simply a

8    business record, custodian stipulation that the printout of

9    licenses issued by Dean are business records.  It says nothing

10   about days that Ms. Dean worked or what her employment was.

11           THE COURT:  It strikes me as much more efficient to

12   allow defendant to withdraw the stipulation and have perhaps an

13   affidavit about the business records.  That will avoid one

14   issue down the road.

15           MR. SOUTHWELL:  Perhaps, what I could propose is that

16   we proceed today on the basis that these are documents in

17   evidence and we can at a later date, if necessary, get an

18   affidavit that the documents that were provided were, you know,

19   such documents.  Frankly, I don't really think it's necessary

20   because they are already in evidence and what the analysis --

21           THE COURT:  But did they get into evidence by virtue

22   of defense counsel's stipulation?

23           MR. SOUTHWELL:  Yes, they did.

24           THE COURT:  I think that is an issue that you don't

25   want to have down the road.  I think it would be inefficient.

5

65CAAOZSH                    Hearing

1    All you need is an affidavit from the custodian?  Isn't that

2    right?

3          MR. SOUTHWELL:  Right.  That's fine.  It would just

4    delay the ultimate -- you know, actually getting to the

5    ultimate end of the case with respect to this Court but I think

6    if it's permissible to proceed subject to connection we will

7    put that all in.  We will get the affidavit and that will --

8    it's -- what the affidavit relates to is Government Exhibit 10

9    and 11 which were, it was basically a printout, electronic

10   printout of the licenses Dean issued and then a collection of

11   some applications for those and all we're going to be using

12   today is ten and some documents that were prepared based on

13   ten.  All of which were already admitted into evidence at trial

14   but we can certainly get an affidavit to the affect of what is

15   in this stipulation and then just proceed today subject to

16   connection.

17         THE COURT:  And the key factual point that would be

18   stated in the affidavit is that these were issued by Gwendolyn

19   Dean, notwithstanding, an in absence of records of certain

20   kinds of records indicating she worked these days.

21         MR. SOUTHWELL:  Right.  I think -- I don't know

22   what -- defense counsel certainly informed me of this.  I don't

23   know what effort they went to find it.  I don't know what state

24   their record are --

25         THE COURT:  To find what?

65CAAOZSH                    Hearing

1          MR. SOUTHWELL:  To find the records as they relate to

2     Ms. Dean's employment.

3          THE COURT:  Why don't we -- I understand.  And so I

4     think I am wasting your time if we continue.  You'll just check

5     and let us all know.  So they can be admitted provisionally and

6     I have two questions for the government that I don't want to

7     lose track of, so I'll mention now.  They don't relate to your

8     witnesses.

9          Defense counsel claims that Borya is Fetasof and that

10    there is a statement in the March 19, 2002 telephone call that

11    Borya is connected somehow to insurance fraud; is that what you

12    are claiming, Mr. Seidler?

13         MR. SIEDLER:  Yes, your Honor.

14         THE COURT:  And is that based on page 155?

15         MR. SIEDLER:  Yes, your Honor.

16         THE COURT:  At the bottom?

17         MR. SIEDLER:  Yes, your Honor.

18         THE COURT:  And how would I relate the word Borya to

19    insurance fraud based on this?

20         I think you need to speak louder or look toward the

21    court reporter.

22         MR. SIEDLER:  Actually, the transcript they're talking

23    about the driver's license scam but not particularly about the

24    insurance.

25         THE COURT:  All right.  And so you would withdraw your

65c5ozs2

1    if you will give me a chance, your Honor.

2           THE COURT:  Go ahead.

3           THE DEFENDANT:  First of all, I don't know why I came

4    to this Court today, for what purpose.  10 days ago my attorney

5    visited me at the MCC.  He told me that June 14th letter issue,

6    Fedesov issue.

7           INTERPRETER:  The interpreter is repeating

8    acoustically without understanding the meaning.  "Fedesov

9    issue."

10          THE DEFENDANT:  My attorney told me that we would be

11   going to court in order to explain the lies that were stated

12   during the trial by the witnesses testified during the trial by

13   Igor Sworkin, Ridvan Sezer and Iouri Bobik, and Campanella.

14          THE COURT:  Would you like to take the stand now?

15          THE DEFENDANT:  None of my motions that I submitted,

16   the motions that are made have been responded to, have been

17   answered by the prosecution.

18          If now if I'm to take the stand and I cannot express

19   my wishes, what I have to say, what I need, what I feel that

20   needs to be stated, then what is the purpose of this Fatico

21   hearing?  And I didn't even know that this was Fatico hearing.

22          According to what my attorney tells me is the Judge

23   has made an order or a ruling and I cannot make a statement or

24   I cannot say anything.  If this is the situation, why am I

25   coming to Court if everything is decided?

65c5ozs2

1    THE COURT:  Mr. Seidler.

2    MR. SEIDLER:  I never told Mr. -- you know, I --

3    THE COURT:  I'm sorry.  Please speak loud.

4    MR. SEIDLER:  I never told Mr. Ozsusamlar that he

5 can't say anything.  I told him that he can't say anything with

6 regard to the Rule 33 motion that's pending because that's not

7 the topic of what we are doing now and that we are here to

8 discuss sentencing issues and his testimony had to be limited

9 to those issues and that's what your Honor ruled on and that's

10 what we had to accept.

11    That's all I said.  I never said he can't testify.

12    THE COURT:  I understand what you say.

13    Did you advise Mr. Ozsusamlar that we would be hearing

14 testimony today on issues for sentencing, essentially the

15 number, if any, of fraudulent licenses that could be attributed

16 to your client?

17    MR. SEIDLER:  Yes.  That's been the subject of

18 transmissions back and forth now for almost two years.  It was

19 adjourned for that purpose the last time we were in court.  It

20 was adjourned for a Fatico hearing on those issues.

21    I also, when I went to see him, I explained that the

22 Rule 33 issue was still open and that those issues still had to

23 be decided by the Court.

24    THE COURT:  I will be deciding them.  I will be

25 issuing a decision shortly on those motions.



65c5ozs2

1          The only issue before us today is the sentencing issue

2     I have just described.  Mr. Ozsusamlar, if you want to testify

3     about that issue, come forward now.

4          THE DEFENDANT:  As the attorney told me inside and as

5     the interpreter heard inside is that I cannot say anything so

6     why should I take the stand and go there if I cannot say what I

7     want to say?

8          THE COURT:  Mr. Ozsusamlar, I know that you are a

9     smart man.  I know that you understand what has been happening

10    in earlier proceedings here and that you understand what

11    Mr. Seidler just said to you.  Now, it is your decision whether

12    you want to take the stand to testify about the sentencing

13    issue I described.  If you do not, then sit down.  If you wish

14    to, come forward.

15         THE DEFENDANT:  No, the prosecution has had the

16    opportunity to bring forth all the statements, witness

17    testimonies, things that have been said by other people before.

18    They have brought it up and I was told that I can refute them.

19    What has been said as the Judge, yourself, your Honor, has told

20    me, I can refute those so that's why I want to prove the lies.

21         THE COURT:  Come forward.

22         THE DEFENDANT:  (In English)  Thank you.  Can I take

23    my file with me?

24         THE COURT:  Yes.

25    MUSTAFA OZSUSAMLAR,

4560ZS1                    keeper - cross

1    Q.  It was airy?  There was sunlight or windows?

2    A.  There were windows.  Nighttime.  There are windows.

3    Q.  You offered Mr. Ozsusamlar food?

4    A.  I did, which he turned down.

5    Q.  You asked him how he was feeling, if he had any medical

6    problems?

7    A.  Yes, I did.

8    Q.  You said you provided him with an interpreter but he

9    decided against it?

10   A.  That is correct.

11   Q.  And you then described a statement which he made; correct?

12   A.  That is correct.

13   Q.  Now, when you were offering him these amenities, did you

14   offer him a tape recorder so that his statement could be

15   recorded on the machine?

16   A.  No, I did not.

17   Q.  Did you ask him to sign his written statement?

18   A.  No, I did not.

19   Q.  Now, this statement that you were taking from

20   Mr. Ozsusamlar was being used for Immigration purposes as well

21   as possible criminal charges; correct?

22   A.  From the defendant?

23   Q.  Yes.

24   A.  That's correct.

25   Q.  Let me go back to earlier on December 5, 2001 on the

456UOZS2                        Leeper - cross

1    that they are illegal aliens.

2              And there is a statement that is given to the judge

3    that is the respondent's own words.  So an interpreter is

4    either called and we do a conference call with the interpreter

5    the agent or agents and the respondent.  And English is spoken

6    within the context of that, as well as the native tongue is

7    spoken within the context of that.

8              It is written down at some point, and it is gone over

9    and then it is signed before the actual interpreter is out of

10   the picture.  So it is a mix of both English and of the native

11   tongue.

12   Q.  You do that because, as you say, it is important because it

13   is going -- the document, the statement -- to go before a

14   judge?

15   A.  Yes.  That's correct, absolutely.

16   Q.  You testified as well that with regard to Government

17   Exhibit 43 --

18              MR. SEIDLER:  Could I have that up, please.

19   Q.  -- that was $3700 that was found in Ozsusamlar's wallet?

20   A.  That's correct.

21   Q.  And all of the bills were 50s and 100s?

22   A.  In the wallet he had some money on him also, but what was

23   actually in the wallet, that is it.

24   Q.  Were they new bills?

25              You can look at them to see if that refreshes your

456UOZS2                    Leeper - cross

1    recollection.

2    A.   I don't need to be refreshed.   I appreciate that.

3         I remember counting out all of the money.   It was a

4    conglomeration of newer bills and older bills.   It looked like

5    there were very new bills, crisp to the touch.   And also as you

6    looked at them, they were clean.   And then there were others

7    that had been handled quite a bit.   It was a range.   It didn't

8    all look like it came from the bank, from one source; it looked

9    like it had come from more than one.

10   Q.   How much money did Mr. Ozsusamlar have on his person other

11   than the $3700?

12   A.   It was under $100.   It was like 90-something.   I cannot

13   remember exactly.   It was under $100.

14   Q.   Yesterday you also testified that with regard to Government

15   Exhibit 34A --

16        MR. SEIDLER:  May I have that, please.

17   Q.   -- that the name Patel is mentioned?

18   A.   Yes.   If you look at the lefthand corner towards the top of

19   the document.

20   Q.   What comes --

21   A.   Sideways, it says P-A-T-E-L, space, which is Patel.

22   Q.   Right.   And then D.C., correct?

23   A.   Then the letters D-C.

24   Q.   Then what is the next word?

25   A.   I don't know if I can read all of that.

455UOZS1                        Leeper - direct

1   an opportunity to search his person?

2   A.   Yes, I did search the defendant.

3   Q.   What if anything did you find on him?

4   A.   Among other things, I found two pieces of yellow paper in

5   his pockets.   And on those pieces of paper were names.   There

6   were some dates of birth and, also, some phone numbers on them.

7   It appeared to me it was a cheat sheet, so to speak, of the

8   people that were in the van.

9            THE INTERPRETER:   Your Honor, excuse me.   The

10   interpreter doesn't know the meaning of "cheat sheet."

11            THE COURT:   Let's strike it from the record.   What is

12   going on in this agent's mind, I think, is something that the

13   jury can figure out on its own.

14            MR. SIEGAL:   Fair enough, your Honor.

15   BY MR. SIEGAL:

16   Q.   Showing you what's been marked as Government Exhibits 34A

17   and B, could you take a look at those, please?   Do you

18   recognize 34A and B?

19   A.   Yes, I do.

20   Q.   How do you recognize them?

21   A.   Because these are the pieces of paper that I pulled out of

22   the defendant's pocket when I arrested him.

23            MR. SIEGAL:   The government offers 34A and B.

24            MR. SEIDLER:   No objection.

25            THE COURT:   Government Exhibits 34A and B are received.

455UOZS1                        Leeper - direct

1   the board -- Champaben Patel, Ramilaben Patel and Bikhabai

2   Patel.

3   A.  Yes.

4   Q.  You look at the second page.

5           MR. SIEGAL:  Let me put this down to make sure that

6   all of the jurors can see.

7   Q.  You can look at the back side of 34A.

8   A.  Yes.

9   Q.  Any names related to any of the folks that you saw in the

10  van?

11  A.  No. 3 on the list, the last name of Mirza, a person in the

12  van also had that same last name of Mirza.

13  Q.  Are you referring to Abid Mirza?

14  A.  I am.

15  Q.  Did there come a time when you asked that anything else be

16  searched in this connection?

17  A.  Yes.  I asked the Metropolitan Police Department to go

18  ahead and do a complete search of the van.

19  Q.  Were any items seized as a result of the search?

20  A.  Yes, they were.

21  Q.  Did you observe the search being undertaken?

22  A.  Yes, I did.

23  Q.  What happened to items seized in the search?

24  A.  I took custody of those items and then I inventoried them

25  in my own evidence locker.

EX:K.

*Cooper, April 22, 2003*

EX:K.

pab

48

1    A   Yes, he did.  He paused a moment and then

2    he said that the New Jersey driver's license with

3    the name Mustafa Ozsusamlar was his real identity

4    and that the D.C. driver's license, the Missta

5    Oscane, was his fake one.

6        I then asked him about the status of, I

7    said, "Well, how about the 'green card'?"

8        And he said, "That's my 'green card.'"

9        I then asked him, "Well, what about what

10    you told me, as far as being a B2 overstay?"  And

11    he said that that was not the truth.  The truth was

12    he was a lawfully admitted permanent resident, and

13    that was his "green card."

14    Q   At any time before this conversation had

15    you advised the defendant of his Miranda rights?

16    A   No, I did not.

17    Q   And what happened at the end of that

18    conversation?  Did you two say anything else?

19    A   At that point, I just got out of the

20    vehicle.  I believe that's all that happened.

21        THE COURT:  I'm sorry.  You previously

22    advised the other individuals of their Miranda

23    rights.

24        THE WITNESS:  Yes, I did, sir.

25        THE COURT:  And this defendant was in the

*looper*

pab                                                                49

1   rear of the police car at the time you interviewed

2   him, right?

3           THE WITNESS:  Yes, sir.

4           THE COURT:  Was there a reason why you

5   didn't advise him of his rights?

6           THE WITNESS:  Yes, sir.  In the first

7   case, with the van-load, I was presented with

8   passports that had a lot of suspicious markings,

9   and lack of visas, and it looked, on its face, like

10  I was going to be making some arrests because they

11  didn't have what it took if this, in fact, were the

12  individuals, if it checked out.  So just kind of as

13  a cautionary thing, I went ahead and read them

14  their rights.

15          I had only a D.C. driver's license on the

16  driver of the van and didn't have anything else to

17  think that, you know, anything was up, except, you

18  know, what they had said about him, but I--so I

19  just approached it from that angle.

20          THE COURT:  All right.  But you knew there

21  was a right answer and a wrong answer to--you gave

22  him choices.  You gave him information from which

23  he could make a choice; is that right?

24          THE WITNESS:  Which one, sir?

25          THE COURT:  This defendant.

*Looper*

1          MR. YETTE:  Oh, well, I think, Your Honor,

2   he may have been talking about the first time he

3   spoke to the defendant outside of the car.  He had

4   not advised him.

5          THE WITNESS:  Yes, right.

6          BY MR. YETTE:

7      Q    Is that right?

8      A    Yes, on my initial contact with him before

9   I even knew what he was, all I had was a driver's

10  license.

11         THE COURT:  Right.  Right.  Did you ever

12  advise this defendant of his rights?

13         THE WITNESS:  No, not at the scene, sir.

14         THE COURT:  All right.

15         BY MR. YETTE:

16     Q    And when you got into the car with the two

17  different identities--

18     A    Yes.

19     Q    --was there a reason you didn't advise him

20  before you spoke with him that time?

21     A    Yes, I was still trying to figure out what

22  was going on.  It was totally investigatory.

23         THE COURT:  I guess my question is this.

24  Was there a right answer and a wrong answer, and if

25  he gave the wrong answer, would he incriminate

1          I THINK THAT WILL ASSIST THE COURT IN DECIDING THAT

2    THESE WERE NOT CUSTODIAL STATEMENTS.

3          THE COURT:  ALL RIGHT.

4          ALL RIGHT, THEN I'LL SEE COUNSEL AT TWO O'CLOCK.

5          I'M GOING TO LET THE JURY PANEL GO.  WE'LL BRING IN A

6    NEW PANEL TOMORROW.  APPARENTLY, THERE'S SOME DISCOMFORT IN THE

7    JURY ROOM.  I DON'T KNOW.  JUST BECAUSE PEOPLE --

8          HAVE THEY BEEN SITTING ON OTHER JURY PANELS OR

9    SOMETHING?

10          THE DEPUTY CLERK:  THEY PROBABLY HAVE.

11          THE COURT:  ALL RIGHT, THEY'VE BEEN HERE HALF A DAY.

12    SO WE'LL BRING IN ANOTHER PANEL, BUT I'LL SEE COUNSEL AGAIN AT

13    TWO O'CLOCK.

14          MR. YETTE:  THANK YOU, YOUR HONOR.

15          MR. SAMAD:  THANK YOU, YOUR HONOR.

16          THE COURT:  THANK YOU, BUT YOU CAN GO AHEAD AND EXCUSE

17    YOUR WITNESSES FOR THE DAY, IF YOU WANT TO, COUNSEL.

18          MR. YETTE:  THANK YOU.

19          (RECESS FROM 12:03 P.M. TO 2:45 P.M.)

20          THE COURT:  WHAT'S STILL TROUBLING THE COURT IS THIS

21    MIDDLE-EASTERN REFERENCE.

22          LET ME JUST ASK THE GOVERNMENT.  SUPPOSE THAT WERE

23    REMOVED FROM THE DECISION-MAKING PROCESS, THE ETHNIC ORIGIN OF

24    THESE PEOPLE.  WOULD THERE STILL BE ARTICULABLE SUSPICION?

25          MR. YETTE:  YES, YOUR HONOR.  YOU COULD PUT AN ENTIRE

1    VANLOAD OF CAUCASIANS, BLACK PEOPLE, WHATEVER KIND OF PEOPLE

2    YOU HAVE.  THE IMPORTANT POINT IS FILLING OUT APPLICATIONS IN

3    FRONT OF A GROUP OF PEOPLE, IN FRONT OF THE DMV, AND THEN,

4    BECAUSE THAT IS NOT YOUR TYPICAL SCENARIO WHERE -- TYPICALLY, A

5    PERSON IS GOING TO GO TO THE DMV AND FILL OUT THEIR OWN

6    APPLICATION.  HERE, IT'S LIKE HE'S INTERVIEWING SOMEONE TO FILL

7    OUT AN APPLICATION FOR SOMEONE ELSE, WHICH COULD BE INNOCENT,

8    BUT THEN YOU HAVE THE REACTION OF THE DEFENDANT WHEN HE

9    REALIZES THE OFFICER IS THERE, WHICH IS TO HIDE THAT

10   APPLICATION.  WHY HIDE IT IF IT'S PERFECTLY LEGITIMATE?  SO,

11   EVEN IF IT WERE A GROUP OF CAUCASIANS OR AFRICAN-AMERICANS IN

12   THE CAR, WHATEVER MIX OF PEOPLE YOU HAVE, IT'S THE DEFENDANT'S

13   REACTION, HIS EVASIVENESS.

14           THE COURT:  WELL, THE GOVERNMENT IS GOING TO HAVE TO

15   BRING IN SOME KIND OF AUTHORITY THAT SUPPORTS WHAT YOU JUST

16   SAID.  I MEAN, IT'S VERY TROUBLING THAT THE UNITED STATES COMES

17   TO A FEDERAL COURT AND ASKS THAT PROBABLE CAUSE BE FOUND

18   BECAUSE SOMEONE MATCHING AN ETHNIC DESCRIPTION OF SOMEONE WHO

19   THE POLICE OFFICER BELIEVES COMMITTED CRIMES IN OTHER

20   JURISDICTIONS HAS DONE SOMETHING WRONG.  THAT'S VERY TROUBLING,

21   INDEED, AND I THINK THAT THE LOGICAL QUESTION IS, IF YOU REMOVE

22   THAT FROM THE EQUATION, IS THERE STILL ENOUGH?  I'M NOT SURE

23   THERE IS.  I'M NOT SURE THERE IS, AND I'M NOT SURE HOW FAR

24   JUDGES SHOULD GO IN DETERMINING, YOU KNOW, WHETHER OR NOT

25   ETHNIC ORIGIN, WITHOUT MORE, IS SUFFICIENT FOR SOME SORT OF

pab                                                                        55

1   then--

2       Q    Excuse me.  At any time before that, after

3   you got out of the car, had this defendant been

4   searched?

5       A    I never searched him.  I'm not aware of

6   anyone that searched him.

7       Q    Had he ever been handcuffed prior to you

8   giving the order to handcuff him?

9       A    No, he wasn't handcuffed until after both

10  interviews had happened and I made a determination

11  that we had probable cause to arrest each and every

12  one, and then we arrested, we actually put the

13  handcuffs on everybody at the same basic time.

14      Q    Now, did you take the defendant back to

15  your office?

16      A    I did.

17      Q    Where was that located?

18      A    That's in Alexandria, Virginia.

19      Q    Did you conduct an interview of the

20  defendant at your office?

21      A    I did.

22      Q    Before that interview, did you advise him

23  of his Miranda rights?

24      A    I did.

25      Q    Describe how that interview took place.

1     MR. YETTE:  NO, YOUR HONOR, BUT I THINK --

2     THE COURT:  OR IF SOMEONE IS A BLACK MAN, THAT'S *PRIMA*

3  *FACIE* SUSPICIOUS ACTIVITY?

4     MR. YETTE:  NO, YOUR HONOR.

5     THE COURT:  IT'S VERY TROUBLING, THIS SCENARIO OF

6  FACTS THAT THE GOVERNMENT HAS PRESENTED AND ASKING THE COURT TO

7  PUT ITS IMPRIMATUR ON IT.

8     MR. YETTE:  WELL, YOUR HONOR, THE FACTS ARE WHAT THEY

9  ARE.  I CAN'T CHANGE THE MIX OF PEOPLE THAT WERE ACTUALLY IN

10  THE VAN, AND WE CAN'T CHANGE THE TIMES THAT WE ACTUALLY LIVE

11  IN.  THIS WAS ONLY THREE MONTHS AFTER SEPTEMBER 11TH, AND I'M

12  NOT EVEN --

13     THE COURT:  IS THERE ANY AUTHORITY WHATSOEVER THAT

14  SAYS THAT JUDGES POST 9/11 ARE SUPPOSED TO TREAT FACT SCENARIOS

15  DIFFERENTLY THAN THEY DID BEFORE 9/11?  I'M NOT AWARE OF ANY.

16     MR. YETTE:  NO.  THE CASE LAW HAS ALWAYS BEEN THAT YOU

17  LOOK TO THE TOTALITY OF THE CIRCUMSTANCES, AND WHETHER OR NOT

18  WE LIKE IT, THIS IS PART OF THE TOTALITY OF THE CIRCUMSTANCES.

19  THE COURT CAN IGNORE THAT OR MAYBE NOT FACTOR THAT IN, BUT I

20  CAN'T CHANGE THE MIX OF THE PEOPLE THAT WERE IN THE VAN.  THAT

21  IS PART OF THE EQUATION, THE TOTALITY OF THE CIRCUMSTANCES.

22  THAT'S JUST THE WAY IT IS IN THIS WORLD, AND IT WOULD BE NICE

23  TO AVOID RACE IN ALL CIRCUMSTANCES, BUT MANY TIMES WE ARGUE

24  THAT RACE IS A RELEVANT FACTOR, IN THE AFFIRMATIVE ACTION --

25     THE COURT:  OH, THAT'S COMPLETELY DIFFERENT.  THAT'S

EX.J-A.

EX.J.A.

CRIMINAL JUSTICE INFORMATION SERVICES DIVISION, CLARKSBURG, W V

PRIVACY ACT OF 1974 (P.L. 93-579) REQUIRES THAT FEDERAL, STATE, OR LOCAL AGENCIES INFORM INDIVIDUALS WHOSE SOCIAL SECURITY NUMBER IS REQUESTED WHETHER SUCH DISCLOSURE IS MANDATORY OR VOLUNTARY, BASIS OF AUTHORITY FOR SUCH SOLICITATION, AND USES WHICH WILL BE MADE OF IT.

| JUVENILE FINGERPRINT | | DATE OF ARREST | ORI |
|---|---|---|---|
| REMISSION | YES ☐ | MM   DD   YY | CONTRIBUTOR  DCMPD0000 PD |
| TRY AS ADULT | YES ☐ | 12/06/2001 | ADDRESS  WASH, DC |
| | | | REPLY      YES ☐ DESIRED: |

| SEND COPY TO: ENTER ORI | DATE OF OFFENSE | PLACE OF BIRTH (STATE OR COUNTRY) |
|---|---|---|
| | MM   DD   YY | TY |
| | 12/05/2001 | |

SCARS, MARKS, TATTOOS, AND AMPUTATIONS

RESIDENCE/COMPLETE ADDRESS

**184 EAST 3RD ST NYC  10009**

LOCAL IDENTIFICATION/REFERENCE

**LINDSAY**

EMPLOYER AND ADDRESS

**TITLE 18 US CODE 1028**

2948

**METROPOLITAN POLICE DEPARTMENT**
Washington, D.C.
**ARREST PROSECUTION REPORT**

PD. 163 Rev. 5 84                G.O. 401 5

| | |
|---|---|
| 1. PERSON NOTIFIED OF NAME CHANGE - UNIT - DATE - TIME - NCIC (ID ID Only) | 2. CID NUMBER (ID Only) ▶ 518257 |
| 3. DEFENDANT'S TRUE NAME - LAST, FIRST, MIDDLE (ID Only) | 4. CID NUMBER |

5. UNIT-ARREST NO. GOTO3734 650100006
6. DEFENDANT'S NAME - LAST, FIRST, MIDDLE (At time of arrest) Ozsusamlar, Mustafa
7. DEA LAB NUMBER

8. Arresting Officer's Name L. Branson
9. TYPE OF RELEASE ☐ CITATION ☐ BOND ☐ COLLATERAL
10. NICKNAME - ALIAS ▶ Missta Oscane
11. PHONE NUMBER 917-405-3073

Rank Mfc. Badge # 263 Agency MPD
12. COURT DATE 12/06/01
13. ADDRESS Include Room - Apt No. City & State if Outside D.C. ▶ 184 East 3rd ST. N.Y.C. 10009
14. TIME IN D.C.

15. ☐ CHILD ABUSE  ☐ GANG  ☐ HATE  ☐ SENIOR CITIZEN  ☐ DOMESTIC VIOLENCE   SPECIAL INTELLIGENCE
16. SEX ▶ M
17. RACE ▶ W
18. BIRTHDATE 2/1/44
19. SOCIAL SECURITY NUMBER 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

20. NEED INTERPRETER Yes ☐ No ☐
21. HEIGHT 5'5"
22. WEIGHT 170
23. HAIR Blk
24. EYES Brn
25. COMPLEX.
26. PERMIT NO/ST
27. BIRTHPLACE (City & State) Turkey

28. ▶ CO-DEFENDANTS: Number _____ (If more than 3, list on back)
NAME, ADDRESS, ZIP CODE AND PHONE NUMBER
29. IMPERSONATOR?   M   F
30. ETHNICITY
31. CAUTION

| | | |
|---|---|---|
| | 32. SCARS/MARKS/TATTOOS | |
| 2. | 33. HAT | 34. JACKET | 35. PANTS |
| | 36. COAT | 37. SHIRT | 38. SKIRT DRESS |
| 3. | | |

39. WALES/NCIC CHECK
CHECK MADE BY (Name) ROBINSON
NCIC NUMBER 64372
WARRANT ON FILE (If Yes, enter Warrant Number(s).) Yes ☐ No ☐

40. LOCATION OF OFFENSE (Exact Address, include Room - Apt No.) ▶ 500 block Indiana Ave NW
DATE OF OFFENSE ▶ 12/05/01
TIME OF OFFENSE ▶ 1535

41. LOCATION OF ARREST (Exact Address, include Room - Apt No.) ▶ 500 block Indiana Ave NW
DATE OF ARREST ▶ 12/05/01
TIME OF ARREST ▶ 15

42. ASSISTING OFFICER'S NAME, BADGE NO. & UNIT OR AGENCY ▶ Mark Leeper   INS
ASSISTING OFFICER'S NAME, RANK, BADGE NO. & UNIT OR AGENCY ▶ Angelo Parisi D194 MPD

43. DEFENDANT ADVISED OF RIGHTS
DATE 12/05/01
TIME 23°°
LOCATION INS Field Office
OFFICER'S NAME - ADVISING  COMPLETING PD FORM 47 47A Mark Leeper
BADGE NO.
UNIT INS

44. COMPLAINANTS - WITNESSES (If sworn member - Name, Rank, Badge No. and Unit) MORE ☐ See Back

| | NAME - LAST, FIRST, M.I. | ADDRESS - STREET, CITY, STATE, ZIP CODE | BIRTHDATE | HOME PHONE NO. | WORK PHONE NO. |
|---|---|---|---|---|---|
| W-1 ▶ | | | | | |
| W-2 ▶ | | | | | |

45. SPEC. OPS.
46. TACTICS
47. PREMISES
48. SCHOOL ZONE ☐   PUBLIC HOUSING ☐

49.
| | CHARGES | NCI OR WARRANT NUMBER | CCN | MPD DISPOS. | COLLA. BOND RECEIPT NO. |
|---|---|---|---|---|---|
| 1. | Title 18 US Code 1028 | | 171453 | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |

*(ENTER THE LEAD CHARGE FIRST)*

50. PROPERTY RECOVERED - ITEMS OF EVIDENCE
PROPERTY BOOK - PAGE NO.      CSES NO.
51. INITIALS - DATE - UNIT OF PERSON TAKING PRINT
52. M.O. WEAPONS, HANGOUTS, HABITS, INSTRUMENTS Involved in Alien Smuggling Obtaining fraudulant I.D.
53. RIGHT THUMB PRINT

54. CCB USE ONLY
| HEIGHT | WEIGHT | HAIR | EYES | COMPLEX. | SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|
| | | | | | |

DISTRIBUTION: Page 1, to ID & RD: Page 2, & 3, to Prosecutor; Page 4, (yellow). Unit Copy; Page 5, Officer's Copy.

PAGE 2         REVERSE CARBON AND FILL IN REVERSE SIDE OF THIS FORM

00100

EX:J.

EX:J.

Case#:
Tape#:   03/19/02
Page     157

I :            IOURI, IOURI, uh, from Brooklyn.

CW:            IOURI from Brooklyn.

I :            [Say,] "I myself am from Florida.  Uh, it's IOURI from Brooklyn that, uh,

               gave me your phone number."

CW:            (UI)

I :            917.

CW:            Hold on.  How much?

I :            (Laughs.)  How much?

CW:            How much?  (Laughs.)

I :            Yes.  917.

CW:            (Laughs.)

I :            4-4-9.  Is it too much?

CW:            (Laughs.)

I :            34-74.  (Joking.)  A shitload.  No, I'm not going to take it//

CW:            //(Laughs.)  917-4-4-9-3-4-7-4?

I :            Yes.

CW:            MUSTAFAH.

I :            MUSTAFAH and RA...RA...

CW:            RAFEL.

I :            RAFEL.  That is, either MUSTAFAH or RAF...or RAFEL.  RAFAEL or

               something.

Case#:
Tape#:  03/19/02
Page      165

CW:   (Takes the phone.)  **Hello?**

**(Response IA.)**

CW:   **Yes, he says we're, uh, eating right now and we'll be there...**

CW:          (To I .)  Like twenty minutes?  Or say thirty minutes?

I :            Maximum half an hour.

CW:   **Max...maximum half an hour.  Is it all right?  Are you gonna,**

**are you still gonna be there?**

**(Response IA.)**

CW:   **Yeah, okay.  Okay, I'll call you right back.  Okay, okay.**

**(Response IA.)**

CW:   **Bye.  Bye.**

**(End of phone call)**

CW:          What the hell is that?!  Shit, my English... Your English is better than his.

I :            No, it's okay.  Why?  (UI)//

CW:          //I can't keep up with his accent.

I :            He's a Turk.

CW:          Where is (UI) King's, King's Highway//

I :            //(UI)

CW:          //...and east Nineteenth.  What does he want?

I :            For us to go there.  He's probably afraid to say something on the phone.

CW:          (UI) phone.

Case#:
Tape#:   03/19/02
Page     183

CW:        About four grand.  Directly, cash.  Four.  Well, up to five grand.  I'll

           collect it [in cash] when I get back.  Is it a Russian driving <u>CL</u>?  <u>CL</u> <u>six</u>

           <u>hundred</u>.  (Brief pause.)  (Yawns.)  <u>EMG</u>.

I:         <u>EMG</u> wheels.

CW:        <u>EMG</u>?

I:         Huh?

CW:        Which are even more expensive, right?

I:         One wheel is about $500.  (UI).

CW:        He is driving it.

I:         And fourteenth, right?

CW:        Yeah, yeah, yeah.  (UI) <u>Arc Way Center (PH)</u>.  (Yawns.)

I:         Well, it is in it.

CW:        Okay, what is his name, I already forgot.  Uh...

I:         Like MUSTAFAH.

CW:        Yes, I'll call <u>MUSTAFAH</u>.  <u>MUSTAFAH</u>.  (Sounds of dialing.)  (UI)

           phone.  Fourteenth (UI).

I:         Say, "I wanted (UI)."//

CW:        //(UI).

                        **(CW aside on the phone)**

**CW:   <u>Hello</u>?**

**(Response IA.)**

EX:1.

EX:1.

1

CAMPANELLA
**3510-I**

UNITED STATES GRAND JURY
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

UNITED STATES OF AMERICA,

      -against-

RAFET OZOGLU,
      a/k/a "Mehmet Ak,"
MUSTAFA OZSUSAMLAR,
      a/k/a "Mustafa Ozcan,"
GWENDOLYNN DEAN,

        Defendants.
----------------------------------------x

        United States Courthouse
        40 Foley Square
        New York, New York

        Thursday, October 17, 2002
        2:17 p.m.

APPEARANCES:

        ALEXANDER SOUTHWELL
        Assistant United States Attorney

        JENNIFER THUN,
        Grand Jury Reporter

ORIGINAL

TANKOOS REPORTING COMPANY, INC.
305 Madison Avenue      142 Willis Avenue
Suite 449            P.O. Box 347
New York, N.Y. 10165    Mineola, New York 11501
  (212)349-9692         (516)741-5235

J. Campanella - 10/22/02

insider inside the Department of Motor Vehicles, a

female who could supply driver's licenses.

Q.    Did you learn whether Mr. Bobik ever

obtained -- himself obtained any Washington, D.C.

drivers' licenses?

A.    Yes, Mr. Bobik advised me that using the

name Yuri Nikolaev, he paid Cesar the money for the

driver's license and in turn traveled from the New

York City area to Washington, D.C. on Avenue C

outside the Department of Motor Vehicles in the

District of Colombia.  Rafet and Mustafa, in turn,

filled out his application and took him inside the

Department of Motor Vehicles which, in turn, he

received a driver's license in the name of Yuri

Nikolaev.

Q.    Did you learn from Mr. Bobik about what

you paid for that license under the name Yuri

Nikolaev?

A.    He paid $2,000 for that license

approximately $2,000.

Q.    And did you learn about whether he paid

for that initially?

A.    He initially paid Cesar that money in

Brooklyn and Mustafa and Rafet finished the

J. Campanella -  10/22/02

transaction in the District of Colombia for him.

Q.    When you say "finish the transaction,"
what do you mean?

A.    Process the license, filled out the
application and escorted him inside the Motor
Vehicle Department on Avenue C in the District of
Columbia.

Q.    Did you learn whether Mr. Bobik had any
further involvement with this conspiracy to obtain
Washington, D.C. driver's licenses for other people?

A.    Yes, Mr. Bobik was in the business of
providing clients who needed identification
documents.  He provided Rafet, Mustafa and Cesar
with approximately five or six more clients who
wanted and obtained a Washington, D.C. driver's
license.

Q.    And what was the cost for those driver's
licenses?

A.    Again, it was approximately $2,000 per
license.

Q.    Now, did you learn any additional
information about the operations of this fraudulent
identification document conspiracy?

A.    Yes.  I learned on December 5, 2001

J. Campanella - 10/22/02

2 Mustafa Ozsusamlar had been arrested in the District

3 of Columbia.  Mr. Ozsusamlar had driven a van from

4 the New Jersey area to the Department of Motor

5 Vehicles office in the District of Columbia on

6 Avenue C.

7       A Washington, D.C. police officer had

8 observed Mr. Ozsusamlar inside the van filling out

9 applications for driver's licenses for several

10 foreign nationals.  The police officer notified

11 federal authorities, who subsequently arrested

12 Mr. Ozsusamlar on December 5, 2001.

13       Mr. Ozsusamlar in his post-arrest

14 statement told federal authorities that he was in

15 the business of supplying identification documents

16 and that one of his partners was, in fact, Yuri

17 Nikolaev.

18       Q.    Again, to be clear, what do we -- what

19 did you learn about who Yuri Nikolaev was?

20       A.    Yuri Nikolaev, in fact, Iouri Bobik.

21       Q.    And what was the basis -- how is it that

22 you know about this arrest in December of

23 Mr. Ozsusamlar?

24       A.    I was advised by an Immigration agent in

25 the District of Columbia of this arrest.

Case#:
Tape#:   03/19/02
Page     158

CW:                MUSTAFAH.  RAF... RAF... (UI).

I :                Call, call him directly.

CW:                (UI).  IOURI.  (UI) which IOURI.  Which one of them?  Which one?

**(CW on the phone)**

**CW:   Hello?**

**(Response IA.)**

**CW:   Uh, may I speak with MASTA...MUSTAFAH?**

**(Response IA.)**

**CW:   Hold on one second.**

**(Response IA.)**

CW:                Here.  (Hands the phone to I .)

**I :     Hello?**

**(Response IA.)**

**I :     Hello, MUSTAFAH?**

**(Response IA.)**

**I :     This is IOURI.  IOURI.  [Do] you remember me?**

**(Response IA.)**

**I :     How are you?**

**(Response IA.)**

**I :     Listen, is my friend.  He, uh, wants, you know...**

**(Response IA.)**

EX:G.

1    states of the United States, Washington, Florida, and North

2    Carolina.  I'm sorry, Washington, D.C

3              In addition, I staged car accidents in order to

4    receive medical benefits.  In addition, I participated in

5    obtaining money for fraudulent insurance documents, insurance

6    claims.

7              THE INTERPRETER:  I'm sorry.

8              THE DEFENDANT:  This is basically essentially all the

9    violations, crimes I committed.

10             THE COURT:  Mr. Bobik, with respect to the conspiracy

11   to commit bribery of a public official, did you meet with

12   anyone in Manhattan in connection with that illegal agreement?

13             THE DEFENDANT:  Yes, I met people in Brooklyn and

14   Manhattan.

15             THE COURT:  When you met people in Manhattan, do you

16   recall when it is that you did that?

17             THE DEFENDANT:  I believe it was May 19 of 2002.

18             THE COURT:  And at that time, sir, did you discuss how

19   you could fraudulently obtain Social Security cards and

20   driver's licenses?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  And with respect to Count Two, the bribery

23   of a public official -- before we get to that.

24             With respect to this conspiracy, what thing of value

25   did you agree to give to a public official in order to obtain

| I: /C: | [Sighs] |
|---|---|
| C: | You know . . . I have a pity for this man. He. . . . He did a lot - - that the individuals there could earn money now. Do you know? He helped everyone. But all this - - as a result . . . [Mumbles. Banging sounds in the background] |
| I: | Wait . . . Who is this one MUSTAFA? Or . . . This particular (UI)? |
| C: | Both of them. They (UI). |
| I: | Both of them? |
| C: | Yes. (UI) The individual is here for twenty years. The individual is not the first time there. The individual already knows everyone. The individual knows it all. The individual knows the laws better than they do. [Short pause; rustling sounds; clicking sounds in the background] Who needs it? I don't know . . . (SC) |
| I: | And . . . I think . . . I think, "What is this particular . . . ?" You started . . . (SC) |
| C: | I started because I . . . Will  you, please,  understand it yourself? What for do I need . . . (SC) |
| I: | I got it. Now I got it everything.  Just (UI) [Rustling sounds and noise in the background jam the conversation] |
| C: | (UI) I say, "Here's . . . I won't do anything more . . . I won't talk with anyone . . . I won't do anything more.  Whoever will ask me, [I'll respond], "I don't know . . . "[Mumbles (UI)] |
| I: | Oh . . . You . . . (SC) [Rustling so sounds in the background] |
| C: | [Continues to mumble (UI)] |
| I: | Hmm . . . |
| C: | Right? |
| I: | It's interesting . . . Interesting |
| C: | What? |
| I | This is interesting - - here's . . . |
| C: | Really? (UI) |
| I: | [Rustling sounds in the background] (UI) |

EX:F.

O-...(Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription 12/30/03

BORIS FEDOSOV voluntarily furnished the following information while in the United States Attorney's Office (USAO) in the Southern District of New York (SDNY).

FEDOSOV entered the United States in 1993 from the former Soviet Union (Ukraine). In January, 1995 FEDOSOV received his green card bearing A#071159768. FEDOSOV is currently awaiting his United States citizenship. FEDOSOV resides at 1103 Gilmore Court, Brooklyn, New York and utilizes Post Office Box 1421 Sheepshead Bay Road, Brooklyn, New York.

FEDOSOV was a doctor in the former Soviet Union and was initially employed as a plumber's helper in New York. Currently FEDOSOV operates FINANCIAL AUTO SERVICES, 1684 East 18th Street, Brooklyn, New York.

FEDOSOV's New York State driver's license was suspended in 2000 due to parking tickets and driving infractions.

FEDOSOV's associate, IOURI BOBIK, told him about the availability of Washington, D.C. driver's licenses. FEDOSOV knew RAFET, MUSTAFA and possibly SEZER, were involved with these licenses. These people were Turks. The cost of the Washington, D.C. driver's license was one thousand, five hundred dollars ($1,500.00).

FEDOSOV recalled driving to Washington, D.C. with BOBIK. They drove to the Motor Vehicle Department by the Canadian Embassy and parked BOBIK's vehicle. BOBIK went to look for the person to help them with the driver's license. FEDOSOV recalled seeing a white minivan with five (5) to seven (7) people. The driver of this minivan was a:

| | |
|---|---|
| Sex: | Male |
| Ethnic: | Turk |
| Hair: | Black |
| Height: | 5'9" |
| Age: | Approximately 30 - 35 years of age |

MUSTAFA, the other Turk, was in his forties.

FEDESOV

**3507-A**

Investigation on  12/30/03  at New York, New York

File # ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓          Date dictated 12/30/03

by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of  BORIS FEDOSOV _____ On 12/30/03 ___ Page ___2___

     FEDOSOV was given a motor vehicle application to complete while in the parking lot.  BOBIK had discussed the address to use on the motor vehicle application with the Turkish people.

     The male Turks directed FEDOSOV into the motor vehicle office with two (2) other clients.  One of the male Turks remained outside the Department of Motor Vehicles (DMV) office while another was inside the DMV.  FEDOSOV was instructed by a male Turk to go to a specific window inside the motor vehicle.  FEDOSOV and the other two (2) clients went to a window run by a skinny black female.  The black female took FEDOSOV's motor vehicle application and processed his driver's license.  FEDOSOV did not present any identification to the black female during this process.  FEDOSOV was then photographed for his driver's license.  The two (2) clients with FEDOSOV were Russian and Eastern European males.

     After receiving his Washington, D.C. license, FEDOSOV paid BOBIK one thousand, five hundred dollars ($1,500.00).  BOBIK, in turn, paid the Turks.  While standing outside the motor vehicle office FEDOSOV saw MUSTAFA give the black female cash.

     FEDOSOV lost his Washington, D.C. license while parachuting in southern New Jersey.  On January 15, 2002, he and BOBIK returned to the motor vehicle office in Washington, D.C.  BOBIK could not find the male Turks at this time.  FEDOSOV presented the motor vehicle office with a copy of his license and was subsequently issued a replacement license.  FEDOSOV felt he had been issued the original driver's license three (3) months prior to January 15, 2002.

     FEDOSOV provided the investigating agent with his replacement Washington, D.C. driver's license.

494

45A6OZS5                          Fedesov - direct

1    Q.   What was the name on that license that he showed you?

2    A.   Iouri Nikolayev.

3    Q.   Was that his name?

4    A.   No.   His name is Iouri Bobik.

5    Q.   Did there come a time when you changed your mind about your

6    desire to get one of these Washington DC driver's licenses?

7    A.   Yes.   It was at the end of June or the beginning of July

8    2001.

9    Q.   What happened?

10   A.   One of my acquaintances was arrested because he didn't have

11   a driver's license and I realized that something similar could

12   happen to me, too.

13   Q.   Did you have any discussion with Iouri Bobik about this?

14   A.   Yes.

15   Q.   What happened in that discussion?

16   A.   Iouri said that we would have to make an appointment in

17   order to have one of the Wednesdays in July to be able to go to

18   Washington.

19   Q.   Did he discuss anything that he would need from you in this

20   respect?

21   A.   He said that from my side I would have to provide the money

22   which would be given to the Turkish fellows that will do this,

23   but he will not take any commission or any money from this

24   service.

25   Q.   How much did he say it would cost you?

Ex:E.

Ex:E.





**Class of License:**
    D - Vehicles for non-commercial and personal use. Also Class N

**Endorsements:**
    NONE

**Restrictions:**
    NONE

45

APPLICATION FOR MOTOR VEHICLE DRIVER'S LICENSE ... VOTER REGISTRATION

CHECK ONE BOX  ☑ Driver's License          ☐ Learner's Permit          ☐ Non-Driver's ID

CHECK ONE BOX  ☐ New                       ☐ Renewal                  ☐ Duplicate

If a renewal or a duplicate, are you filing a change of address? ☐ Yes ☐ No (If yes, you must provide proof of the change)
If yes, do you want the new address to be used for voting purposes? ☐ Yes ☐ No

**SECTION 2: Fill in this section completely. PRINT WITH BALLPOINT PEN**

Your Full Name  (Last Name)  **FRANCIS**   (First Name) **BRIAN**   (Middle Name) **G**

Current Residence (Street Address) **NW 311 New York Ave**   Apt. No.

City and State **Washington DC**   Zip Code **20009**

Mailing Address (if different, for voter registration purposes)   ZIP Code

Date of Birth **05 07 62**   Sex **M**   Weight **18.6**   Height **6 0**   Color of Eyes **HZ**   Social Security Number **098 - 09 - 0562**

Do you wish to be an Organ/Tissue Donor? ☐ Yes

Are you a citizen of the United States? (for voter registration only) ☐ Yes

**SECTION 3: (Change of Name Applicants ONLY). PRINT WITH BALLPOINT PEN**

Previously Recorded Name of Applicant  (Last Name)   (First Name)   (Middle Name)

Court Record Number (if Applicable)

**SECTION 4: (Check YES or NO for the following questions)**

1. Has your permit, license or privilege to drive EVER been suspended, revoked, or refused in the District of Columbia or elsewhere? ☐ Yes ☑ No
2. Has it been restored? ☐ Yes ☑ No   If Yes, where? _____
3. Do you have in your possession a valid operator's permit ☐ Yes ☑ No   If Yes, give date of restoration _____
4. Do you have good natural eyesight for driving? ☑ Yes ☐ No   If Yes, where was it issued? _____
   If NO, do you wear ☐ glasses or ☐ contact lenses

**SECTION 5: (Check YES or NO for the following questions)**

Have you ever had, or been treated for, any of the following:

Strokes or Paralysis ☐ Yes ☑ No   Mental Disorder ☐ Yes ☑ No   Glaucoma, Cataracts, or Other Eye Disease ☐ Yes ☑ No   Seizure Disorder or Fainting Spells ☐ Yes ☑ No

Loss of Function in an Extremity ☐ Yes ☑ No   Any Brain Disorder ☐ Yes ☑ No

Alcoholism or Other Drug Abuse ☐ Yes ☑ No   Diabetes ☐ Yes ☑ No   Any Heart Disorder ☐ Yes ☑ No   Poor Muscle Control or Dizzy Spells ☐ Yes ☑ No

Have you any physical impairments not mentioned above, either temporary or permanent?
If YES, explain briefly _____

PHYSICIAN'S CERTIFICATE (Required for applicants 70 years of age and above)
I have examined this applicant and find him/her physically and mentally competent to operate a motor vehicle safely

(Signature of Physician)   (Address, including ZIP Code)

**SECTION 6: Applicant's Certificate**

I certify by my signature, under penalties of perjury, the information given in this application is true to the best of my knowledge and belief.

Signature **Brian Francis**   (Telephone Number)   (Date)

**TO REGISTER TO VOTE IN THE DISTRICT OF COLUMBIA, COMPLETE AND SIGN FORM BELOW**   Date **1-15-02**

DC Department of Motor Vehicles

## APPLICATION FOR DC MOTOR VEHICLE DRIVER'S LICENSE/VOTER REGISTRATION

Would you like DMV to share your personal information with commercial interest? ☐ Yes ☒ No

SECTION 2 CHECK the proper boxes for YOUR application.

**CHECK ONE BOX** ☐ DC Driver's License  ☐ DC Learner's Permit  ☐ DC Non Driver's ID

**CHECK ONE BOX** ☐ New  ☐ Renewal  ☒ Duplicate

If a renewal or a duplicate, are you filing a change of address? ☐ Yes ☐ No (If yes, you must provide proof of the change.)
If yes, do you want the new address to be used for voting purposes? ☐ Yes ☐ No

SECTION 3 IF THIS SECTION COMPLETED, PRINT WITH BALL POINT PEN

| | (Last Name) | (First Name) | (Middle Name) |
|---|---|---|---|
| Your Full Name | FRANCIS | BRIAN | G |

Current Residence (Street Address): 311 NEW YORK AVE NW   Apt. No.

City and State: WASHINGTON DC   Zip Code: 20009

Mailing Address (if different, for voter registration purposes): ____   Zip Code: ____

| Date of Birth | Sex | Weight | Height | Color of Eyes | Social Security Number |
|---|---|---|---|---|---|
| 05-07-62 | M | 190 | 6' 1" | HAZ | 126 - 90 - 6504 |

Do you wish to be an Organ/Tissue Donor? ☐ Yes ☐ No

Are you a citizen of the United States? (for voter registration only) ☐ Yes ☐ No

SECTION 4 (Change of Name Applicants ONLY - PRINT WITH BALL POINT PEN

| Previously Recorded Name of Applicant | (Last Name) | (First Name) | (Middle Name) | Court Record Number (if Applicable) |
|---|---|---|---|---|

SECTION 5 CHECK YES or NO to the following questions:

1. Has your permit, license or privilege to drive EVER been suspended, revoked, or refused in the District of Columbia or elsewhere? ☐ Yes ☐ No   If Yes, where? ____

2. Has it been restored? ☐ Yes ☐ No   If Yes, give date of restoration ____

3. Do you have in your possession a valid Driver's License ☐ Yes ☐ No   If Yes, where was it issued? ____

4. Do you have good natural eyesight for driving? ☐ Yes ☐ No   If NO, do you wear ☐ glasses or ☐ contact lenses

SECTION 6 (Check YES or NO for the following questions)

Have you ever had, or been treated for, any of the following:

| | | | |
|---|---|---|---|
| Stroke or Paralysis ☐ Yes ☐ No | Mental Disorder ☐ Yes ☐ No | Glaucoma, Cataracts, or other Eyes Disease ☐ Yes ☐ No | Seizure Disorder or Fainting Spells ☐ Yes ☐ No |
| Loss of Function | | | |
| In any Extremity ☐ Yes ☐ No | Any Brain Disorder ☐ Yes ☐ No | | |
| Alcoholism or | | Any Heart Disorder ☐ Yes ☐ No | Poor Muscle Control |
| other Drug Abuse ☐ Yes ☐ No | Diabetes ☐ Yes ☐ No | | or Dizzy Spells ☐ Yes ☐ No |

Have you any physical impairments not mentioned above, either temporary or permanent ____ ☐ Yes ☐ No

If YES, explain briefly ____

PHYSICIAN'S CERTIFICATE (Required for applicants 70 years of age and above)
I have examined the applicant and find him/her physically and mentally competent to operate a motor vehicle safely.

(Signature of Physician)   (Address, Including ZIP Code)   (Telephone Number)

SECTION 7 Applicant's Certificate

I certify by my signature, under penalties of perjury, the information given in this application is true to the best of my knowledge and belief.

Signature: Brian Francis   Date: 9-13-02

**TO REGISTER TO VOTE IN THE DISTRICT OF COLUMBIA, COMPLETE AND SIGN FORM BELOW**



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Motor Vehicles
### 301 C Street, NW
### Washington, DC 20001
202-727-5000



**FEDESOV**
# 3507-D

**5 Year Record Request**

Date: 04-05-2004

Name: BRIAN G FRANCIS

Primary Address: 311 NEW YORK AVE NW
WASHINGTON  DC  20009

DLN: 9600626          SSN: 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      DOB: 05-07-1962        Total Current Points: 0

Sex: MALE            Height: 6 feet 00 inches    Weight: 190 lbs    Hair: UNKNOWN      Eyes: HAZEL

## Permit Details:

| Class | ID/License Type | DLN/ID | Permit | Status | Original Issue Dt | Issue Date | Expiration Date |
|-------|-----------------|--------|--------|--------|-------------------|------------|-----------------|
| D | NCDL | 9600626 | REGULAR | VALID | 01-15-2002 | 01-15-2002 | 05-07-2006 |

Page 1 of 1

*www.dmv.dc.gov*

@003

UAT

## D.C. DEPARTMENT OF MOTOR VEHICLES
### MOTOR VEHICLE INFORMATION SYSTEMS
### PERMIT  SUBSYSTEM
QUERY MODE   Version: 3.10

April, 27 Tuesday 2004

Print Screen

---

9600626    05/07/2006 03 Operator Permit                              Active

### Detail Permit / License Data

| | | | |
|---|---|---|---|
| PERMIT NUMBER | 9600626 | STATUS | Active |
| TYPE | 03 Operator Permit | | |
| CLASS | D Vehicles for Noncommercial and Personal use; Also Class N | | |
| ORGAN DONOR | N | | |
| PREVIOUS PERM | 09807062 | | |

RENEVAL  0      ISSUED  01/15/2002

EXPIRED  05/07/2006

DUPLICATES  1    LAST

REPLACEMENT      LAST

#### Restriction

#### Endorsements

ENTERED  07/18/2001     RECORD STATUS  Active     Modified Date 01/15/2002   By:  DHACKNEY

---

| Search Keys | Owner Data | Permit Data | Action Data | Violation Data | Database Info |
|---|---|---|---|---|---|

*EX:D.A.*

*EX:D.A.*



## FACSIMILE COVER SHEET

**U.S. ATTORNEY'S OFFICE, SDNY
ONE ST. ANDREW'S PLAZA
NEW YORK, NY 10007**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:**      Alexander H. Southwell
             Assistant United States Attorney

**Office Phone No.:**   (212) 637-2417

**Fax Number:**      (212) 637-2452

No. pages (including cover sheet): 4

Date sent:   November 8, 2004
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"FOR OFFICIAL USE ONLY" U.S. ATTORNEY FACSIMILE COMMUNICATION

The information contained in this facsimile message, and any and all accompanying
documents, constitute "FOR OFFICIAL USE ONLY" information. This information is the
property of the U.S. Attorney's Office. If you are not the intended recipient of this
information, any disclosure, copying, distribution, or the taking of any action in reliance on
this information is strictly prohibited. If you received this information in error, please notify
us immediately by telephone at the above number and destroy the information.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**To:**      **Alan Seidler, Esq.**
            *Attorney for Mustafa Ozsusamlar*
            **Tel: (212) 334-3131**
            **Fax: (212) 334-2211**

Re:      <u>United States v. Mustafa Ozsusamlar</u>, S2 02 Cr. 763 (KMW)

Remarks:   Please see attached.

If you + he agree to drop the opposition, please sign + return the original
to me. Thanks Alf

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
BY:  Alexander H. Southwell (AHS-0997)
One St. Andrew's Plaza
New York, New York  10007
Tel. (212) 637-2417

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
                                   :
UNITED STATES OF AMERICA,          :
                                   :    STIPULATION AND
                                   :    ORDER OF FORFEITURE
              -v.-                 :
                                   :    04 Civ. 5944 (KMW)
$3,700.00 IN                       :
UNITED STATES CURRENCY,            :
                                   :
         Defendant-in-rem.         :
                                   :
----------------------------------x

        WHEREAS, on or about December 5, 2001, agents of the

United States Immigration and Naturalization Service ("INS"), and

of the Federal Bureau of Investigation ("FBI"), seized $3,700.00

in United States currency ("defendant currency") pursuant to the

arrest of MUSTAFA OZSUSAMLAR ("OZSUSAMLAR"), a/k/a "Mustafa

Ozcan," a/k/a "Missta Oscane";

        WHEREAS, on or about July 30, 2004, the United States

of America (the "Government") commenced a civil action seeking

the forfeiture of the defendant currency;

        WHEREAS, on or about September 21, 2004, OZSUSAMLAR

sent a letter to the U.S. Attorney's office for the Southern

District of New York regarding the defendant currency;

        WHEREAS, the parties have reached an agreement in the

pending matter and wish to settle without resort to further litigation;

IT IS HEREBY STIPULATED AND AGREED, by and between the plaintiff, United States of America, by its attorney David N. Kelley, United States Attorney, Assistant United States Attorney Alexander H. Southwell and Mustafa Ozsusamlar and his attorney Alan Seidler, Esq., 580 Broadway, Suite 717, New York, NY 10012, as follows:

1.   Mustafa Ozsusamlar shall and hereby does withdraw any claim he may have asserting ownership in the defendant currency, and that defendant currency shall be and hereby is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C);

2.   Mustafa Ozsusamlar is hereby barred from asserting any claim against the United States or any of its agents and employees, including the United States Department of Justice ("USDOJ"), United States Department of Homeland Security ("USDHS"), United States Marshal's Service ("USMS"), INS, FBI, and the United States Attorney's Office for the Southern District of New York ("USAOSDNY"), in connection with, or arising out of the United States' seizure and possession of the defendant currency, including but not limited to any claim that the United States did not have probable cause to seize and hold the defendant currency.

3.   Mustafa Ozsusamlar further agrees to hold harmless the United States or any of its agents and employees, including the

USDOJ, USDHS, USMS, INS, FBI, and the USAOSDNY, in connection

with, or arising out of the United States' seizure and possession

of the defendant currency, including but not limited to any claim

that the United States did not have probable cause to seize and

hold the defendant currency.

Dated:    New York, New York
          November __, 2004


                         DAVID N. KELLEY
                         United States Attorney
                         Southern District of New York

          By:    _____
                 Alexander H. Southwell (AHS-0997)
                 Assistant United States Attorney

                 Attorney for Claimant


          By:    _____
                 Alan Seidler, Esq.
                 580 Broadway, Suite 717
                 New York, New York 10012

                 Claimant


          By:    _____
                 Mustafa Ozsusamlar


**SO ORDERED**

Dated: November __, 2004
       New York, New York



                 _____
                 KIMBA M. WOOD
                 UNITED STATES DISTRICT JUDGE

Ex:D.

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
By: ALEXANDER SOUTHWELL (AS-0997)
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2417

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/23/05
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA,          :

                    Plaintiff,     :

          - v -                    :     DEFAULT JUDGMENT
                                         04 Civ. 05944 (KMW)
$3,700.00 IN UNITED STATES         :
CURRENCY
                                   :

                                   :
               Defendant-in rem.   :
-----------------------------------x

          WHEREAS, on July 30, 2004, the United States commenced

a civil action for the forfeiture of the above-referenced

defendant-in-rem ("defendant currency") by the filing of a

Verified Complaint;

          WHEREAS, on August 27, 2004, notices of the verified

complaint were sent by certified mail, return receipt requested,

to: Mustafa Ozsusamlar, New York MCC, 150 Park Row, New York, NY

10007; Rafet Ozoglu, New York MCC, 150 Park Row, New York, NY

10007; Frederick Cohn, Esq., 61 Broadway, Ste. 1601, New York, NY

10012 and Alan Seidler, Esq., 580 Broadway, Ste. 717, New York,

NY 10012; notifying them that they may have an interest in this

action, and of their right to file a claim and answer and contest the forfeiture;

WHEREAS, the foregoing are the only persons known by the Government to have a potential interest in the defendant currency;

WHEREAS, notice of the Verified Complaint and in rem warrant against the defendant currency was published in the New York Law Journal once in each of the three successive weeks beginning on February 8, 2005, and proof of such publication was filed with the Clerk of this Court on March 10, 2005;

WHEREAS, no other claims or answers were filed or made in this action, and no other parties have appeared to contest the action to date, and requisite time periods have expired;

NOW THEREFORE, on the motion of David N. Kelley, United States Attorney for the Southern District of New York, attorney for the plaintiff United States of America, Alexander Southwell of counsel;

IT IS HEREBY ORDERED that:

1.   Plaintiff United States of America shall have judgment by default against the defendant currency.

2.   The defendant currency be, and the same hereby is, forfeited to the plaintiff United States of America.

3.   The United States Marshals Service shall dispose of the defendant currency, according to law.

Dated:   New York, New York
         8 - 22 , 2005

The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED:

~~HONORABLE~~ KIMBA M. WOOD
UNITED STATES DISTRICT JUDGE

EXiC.

LAW OFFICE
OF
**B. ALAN SEIDLER**
580 BROADWAY
ROOM 717
**NEW YORK, NEW YORK 10012**

TELEPHONE
(212) 334-3131
(888) 247-0243
FACSIMILE
(212) 334-2211

October 21, 2004

Mr. Mustafa Ozsusamlar
#18188-050
MCC
150 Park Row
New York, NY 10007

re: USA v. Ozsusamlar

Dear Mustafa;

Call me when you receive these materials.  We have court on October 29th concerning the forfeiture proceeding.

Lastly, that Dominican Consulate list is a fake; written by some jealous USA lawyer several years ago.  If you doubt me, write to the Dominican consulate directly and ask them to provide you with such a list.   You don't have to worry about me.  I will do all I can to help you.

Again, please call me.

Very truly yours,

B/ Alan Seidler

bas/ee

Ex:B.

LAW OFFICE
OF
**B. ALAN SEIDLER**
580 BROADWAY
NEW YORK, NEW YORK 10012

TELEPHONE
(212) 334-3131
(888) 247-0243
FACSIMILE
(212) 334-2211

April 14, 2011



Hon. Kimba Wood
US District Judge
US Courthouse
500 Pearl Street
New York, NY 10007

Re: <u>USA v. $3700 in US Currency</u> - 04 CV 5944 (Kmw)

Dear Judge Wood;

On July 13, 2006, I was relieved by your Honor as Ozsusamlar's attorney, and Scott Tulman was appointed pursuant to the Criminal Justice Act. Quickly thereafter, my case file was turned over to Mr. Tulman.

1, 2, 3, I have not recollection of receiving a notice of motion for a default judgment; a notice of entry of a default judgment; or any communication after November 12, 2004, with the Government concerning the instant forfeiture proceedings. I have no documents concerning these matters.

4. I have no memory of having any communication with Mr. Ozsusamlar concerning the status of the forfeiture matter after November 12, 2004, except that Ozsusamlar accused me of being paid twice because he claimed my legal fee in the criminal case should cover the forfeiture case as well, and I was not entitled to CJA compensation at the same time.

5. I believe Mr. Ozsusamlar wrote to the Court at one point to complain that I was being

paid twice because he claimed my legal fee in the criminal case should cover the forfeiture case as well, and the Court should not pay me as CJA counsel for the purpose of the forfeiture proceeding. However, I also have no documents concerning this issue.

6. I was never retained by Ozsusamlar, or his family to defend his interests in the forfeiture proceeding, and I never submitted a request for CJA payment in connection with said matter. Ozsusamlar's son never paid me $2000 to represent Ozsusamlar in the forfeiture proceeding. I was paid a $5000 sum to represent the son, Osman Ozsusamlar in a criminal proceeding before the Hon. District Judge Denise Cote [05 cr 1077(DLC)]. Subsequently, Osman decided he wanted to retain different counsel at which point on January 6, 2006, I returned $3000 of the $5000 retainer to the same source that paid said retainer on behalf of Osman.

Respectfully,

B. Alan Seidler

cc: AUSA Sharon Cohen Levin

bas/ee

| 07/30/2004 | | SUMMONS ISSUED as to $3,700.00 in United States Currency. (jjm, ) (Entered: 08/02/2004) |
|---|---|---|
| 07/30/2004 | | CASE REFERRED TO Judge Kimba M. Wood as possibly similar to 1:02-cr-763. (jjm, ) (Entered: 08/02/2004) |
| 07/30/2004 | | Case Designated ECF. (jjm, ) (Entered: 08/02/2004) |
| 09/08/2004 | | CASE ACCEPTED AS RELATED TO 1:02-cr-763. Notice of Assignment to follow. (gf, ) (Entered: 09/29/2004) |
| 09/08/2004 | 2 | NOTICE OF CASE assignment to Judge Kimba M. Wood. Judge Unassigned no longer assigned to the case. (gf, ) (Entered: 09/29/2004) |
| 09/08/2004 | | Magistrate Judge Debra C. Freeman is so designated. (gf, ) (Entered: 09/29/2004) |
| 09/29/2004 | | Mailed notice to the attorney(s) of record. (gf, ) (Entered: 09/29/2004) |
| 09/30/2004 | 3 | ENDORSED LETTER addressed to Judge Wood from B. Alan Seidler dated 9/28/04 re: the initial (status) conference is adjourned to October 29, 2004 at 9:30 a.m.; (Signed by Judge Kimba M. Wood on 09/30/04) (djc, ) (Entered: 09/30/2004) |
| 10/28/2004 | 5 | ORDER AUTHORIZING PAYMENT FOR COUNSEL; the Court hereby orders Mr. Ozsusamlar's criminal defense atty Alan Seidler, to represent Mr. Ozsusamlar in this matter. Mr. Seidler will be compensated as per 18 U.S.C. 3006(a) under the authority granted to the Court in 18 U.S.C. 983 (b)(3) ( The Court shall set the compensation for representation under this subsection, which shall be equivalent to that provided for court-appointed representation under sec. 3006A of this title). (Signed by Judge Kimba M. Wood on 10/27/04) (pl, ) (Entered: 11/22/2004) |
| 10/29/2004 | | MEMORANDUM TO THE DOCKET CLERK: Attorney for the Government AUSA Alexander Southwell is present. Mustafa Ozusamlar is present with his attorney, Alan Seidler. Defendant waives presence of interpreter. Mr. Ozsusamlar is to notify the Court and the Government before 11/12/04 as to whether he will proceed with this action. If he does not intend to proceed he is to file a stipulation of settlement by this date. If Mr. Ozsusamlar intends to proceed, the initial conference will take place on 11/12/04 at 12:30 p.m. (yv, ) (Entered: 11/24/2004) |
| 11/12/2004 | | Set Deadlines/Hearings: Initial Conference set for 11/12/2004 at 12:30 PM before Judge Kimba M. Wood. (yv, ) (Entered: 11/24/2004) |
| 11/17/2004 | 4 | ENDORSED LETTER addressed to Judge Kimba Wood from B. Alan Seidler dated 11/12/04 re: granting dfts requests for an adjournment of the conference from 11/19/04 to date in December, 2004; the conference is adjourned to 12/2/04 @9:45 a.m. (Signed by Judge Kimba M. Wood on 11/16/04) (pl, ) (Entered: 11/17/2004) |
| 03/10/2005 | 6 | SERVICE BY PUBLICATION Document filed by United States of America. Last publication date 2/22/05. (Southwell, Alexander) (Entered: 03/10/2005) |
| | | |

| 08/23/2005 | 7 | DEFAULT JUDGMENT in favor of plaintiff against $3,700.00 in United States Currency. (Signed by Judge Kimba M. Wood on 8/22/05) (ml, ) (Entered: 08/25/2005) |
|---|---|---|

## III Defendant Seidler

7- Defendant Mr. Seidler. attorney at law. and lead attorney to plaintiffs Criminal Case No: 02-cr-763.(Kmw). and Case No: 04-cv-05944(Kmw). Mr. Seidler was Legally responsible for the represent plaintiff deffense issue for the bolt case should Be proffessional way justicly in court.

8- Defendant mr Seidler, in same civil action case 04-cv-05944 Appointed CJA by Case judge Kimba M. Wood also. See EXH. A. Docket entry 5. Mean was stilling Tax payers money. legal rubiry.

9- Defendant mr. Seidler is resident and citizen of the state of New york. Addressed 580, Broadway Room 717, New york, NY, 10012. Phone # 212-334-3131.

10- At all timer relevant hereto. Defendant mr. Seidler was acting withing the Course And scope of his proffessional responsibility under color of law.

11- U.S.A - V- Correney (Ozsusamlar) $3,700.00. Case was Ended on Nov-12-2004 by case Judge wood. Faver by plaintiff Ozsusamlar. but Attorney mr Seidler not given Any information to plaintiff Ozsusamlar See. EXH-B and EXH-B-A.

12- Defendant mr, Seidler clearly lie see EXH-B. Paragraph 4 and EXH. A. Docket Entry 5.

13- Defendant mr. Seidler clearly lie. because case 04-cv-05944 be Ended mr, Seidler still lead attorney pluss CJA also, on Nov. 12-2004. and mr Seidler was relieved from Case on july. 13, 2006. retorned criminal case to Attorney scott tulman. See EXH.B. pg. 1.

14- Defendant mr. Seidler, letter to plaintif Ozsusamlar. See. EXH. C.

15- Defendant mr. Seidler legaly lead an CJA. Attorney to Ozsusamlar when default judgment Ordered by case judge wood on 8-22-2005. See. EXH-D.

16- Defendant Coopereted withother violate own proffessional responsibility and plaintiffs U.S.C. Rights. Defendant helping to goverment for convicting innocense plaintiff Ozsusamlar.

17- Defendant mr. Seidler cooperating withother defendant hidding truth case evidence and Excepted untruth renault Case evidence. See, EXH. E.

18- Defendant mr. Seidler Cooperete withother defendant not Quashtined Quashqinible statement By the goverment (CW) Fedesov See, EXH-F.

19 Defendant "NOT" Requested onavilible CW Bobik which the goverment use in frond Of Grand Jury. See. EXH-I. and Bobik plea guilty own word said I involved D-C Driver License in may-19-2002. and phone Conversation recorded by Agent Campanella On 10-10-2002. Bobik Asking who is a person named mustafa a turk. there is approf Cooperation See EXH-G. two pages.

P-2-

20-Defendant mr. seidler "NOT" Requested Grand Jury testimony gived by FBI. Agent Campanella because untruth and under oath perjury testimony. See EXH. I - pgs. 27-28-29

21- Defendant, Hidding plaintiff Arresting Document Dec.05.2001. because jury not finding Guilty defendant helping to goverment under cooperation violating plaintiff Constitution Rights Amendments 4-6-14. See EXH. J.

22- Defendant mr. seidler, under cooperation with another defendant "NOT" Quashgined Under oat given contradicted perjury testimony in different Court Room by Agent Leeper, in washington DC. and NY. See EXH. K. and EXH-K-A.

23-Defendant mr. seidler, Never defendant Ozsusamlar U.S.C. Right violation in court Room by The goverment. about due process/speed trial/perjury/prosecutural misconduct/missleadings.

24- Defendant mr seidler aducated law because a attorney. Defendant knowing should be Know Prosecuter violating Ozsusamlar due process Rights by knowingly using false and Misleading evidence, Coaching (CW) and bribing money to CW. and give INS. legal statue TO CW. for the lie testimony to convict plaintiff Ozsusamlar. Defendant mr seidler a lead Attorney to Ozsusamlar and his responsibilities defense. mr seidler was awere That the testimony misleading, but Consiously decided not to clarify it for jury. See EXH-M.

25-Defendant mr. seidler known the materiality of false testimony in light of only the Evidence supporting the Conviction. the procecutions knowing use of false testimony and Evidence denied him due process where trial counsel knew the testimony was Misleading but made a strategic decision not to clarify it for jury. because defendant Mr. seidler already Cooperated with prosecuter defense was only formality. EXH. L.

26-Defendant Mr. seidler under Cooperation with another defendant, against to own Claint Ozsusamlar. in Court Room said listening 3. goverment witnesses but That is a Fatico hearing for Enhancement Harshe sentencing issues knowingly Under cower hearing and clearly "Hearsay" testimony by goverment Agents (Defendants) Violating 28. U.S.C. 801(A) and 801(B) and 922 803-8(A), 803.8(B), 803,8,C.

27-Defendant mr. seidler. violate own proffessional responsibility and attic Rule. ineffective Assistanse counsel legal rubiry persons knowingly violating plaintiff Constitutional Right Amendment 4-6-14.

28-Defendant a lead Attorney to Ozsusamlar, Defense attorney can not weive defendant Right without permittion by defendant. Commenwelt. v. Cavolo. 92-crl 465 and Commenwelt v. Hardy. SJC. 10874. and see EXH. B-A

Pg-3-

29- Defendant mr. Seidler, can a non default 6. Amendment inneffective assurtance Counsel Claim that has yet to receive a full and fair review receive a ruling on the merit under 28-U.S.C.1651(a)(2) where multible additional Errors affected the Ozsusamlar conviction See. 8.Cir.494.F.APP X.679 Katz V. U.S.12-1326.

30- Defendant mr.Seidler and his co. defendants Cooperating each other knowingly Willfully under Cooperation terrorasing plaintiff Ozsusamlar Constitutional Right violating many Rules of Justice making illegality legal Convicted and makin unusuable panishment long term sentence innocence Ozsusamlar.

31- Plaintiffs reallege and incorporate by reference all paragraphs 1—31.

<u>Deffendant ALEXANDER H. SOUTHWELL.</u>

32- At all time relevant hereto, Southwell was acting the Course and scope of his Employment and under color of law.

33- At all time relevant hereto, Defendant Southwell is a resident and citizen of the state of New york.

34- Defendant Mr. Southwell at violation time working U.S.A. office in southern District Of Newyork, Addressed One saint andrew plaza, New york, NY. 10007.

35- Defendant Southwell New addres. 200. Park Ave. Newyor, NY, 10166. phone #212-351-3981

36- Defendant violating <u>U.S.C. Section 1515.a.1.A</u>, Opstruction of on official proceeding

37- Defendant violating <u>28.U.S.C.801.d.A, and 801.1.B</u> for Hearsay Right plaintiff

38- Deffendan violating <u>28.U.S.C. 803.8,A, 803.8.B, and 803.8.C</u>, plaintiff.

39- Defendant, knowingly and willfully used under oath folsified statement in frondof Grand jury. violating plaintiff U.S.C. Right 4-6-14. <u>see. EXH-1.</u>

40- Defendant under Corperation with other defendant violating own proffessional Responsibility. knowingly and willfully using folse and Fabricating evidence. <u>EXH-E.</u> This evidence main evidence to Conviction for plaintiff Ozsusamlar.

41- Deffendant knowing Ozsusamlar was Jailed in MCC. Correction nexto his office On 8-22-2004 <u>See EXH.D</u> and <u>See. EXH. D-A.</u>

42- Defendant knowing Ozsusamlar (plaintiff) Sentensed Feb. 1. 2007. Defould Judgment bitwen sentence plaintif 17 Different time in Court Room in Frond of Same Judge wood and Defendants Southwell and Seidler there is Under Corperation knowingly Against to plaintiffs violating U.S.C. Rights, plaintiff

43- Defendant Corperate with Defense attorney hidding CW statement. <u>see EXH.F.</u>

44- Defendant coorperate with oter defendant for the under Cover Fatico Hearing

And knowingly willfully use falsified "hearsay" testimony by goverment official and Not gived any information to said we are in fatico hearing. See EXH.L.

45-Defendant Educate law. and under oath goverment attorney, Can not knowingly Violate law and justice. Can not fabricate case evidence coaching C.W. and Bribing money to C.W. and can not give INS. legal statue illegal Alien C.W. but Defendant did that due proces and missleading violation for only to Convict innocence person plaintiff Ozsusamlar. See EXH-M.

46-Defendant Coorperate withoter defendant defence attorney mr. seidler for the peal free due process violation and knowingly using hearsay falsified and missleading Evidence and testimony U.S.C. 6 Amendment violation by defense Counsel only for Conviction to plaintiff Ozsusamlar. see. 8.cir-494.F.APP.X 679 Katz, v, U.S. 12-1326.

47- Defendant did violate plaintiff Constitutional Rights under due process false and Missleading. 5-Cir. Holding. Prosecution knew false testimony and evidence denied him Due process where trial Counsel knew that the testimony was missleading but made a Strategic decision not to clerify it for jury.

48-Deffendant southwell NOT Colling the goverment avilible witnesses and not Colling plaintiff avalible defense witnesses to testified in court Room reasons why defendant not Coached to witness what he whant to say.

49-Defendant colling jail House (snitch) witnes but not excepting to colling Defense witnes which plaintiff wishess there is civil Right violation.

50-Defendant southwell knowingly violate plaintiff Constitutional Rights because He was a prosecuter. prosecuter who adopted and implemented flawed internal Procedures for using jail house informer (snitches) U.S. Court of Appeal, 9. Circuit. Goldstein V. long beach No: 10-56787. Defendant Ozsusamlar rights to law suit Against the prosecuter and Agents Los Angeles County that the defendant failed To aduquately train or suppervise the prosecuter who worked for them and filed to Establish a System for shearing information about informer and see. Supreme Court Ruled in 2009. and Van De kamp v. Goldstein 555. U.S. 335. 84 CrL. 445. (2009). and According to the court, "the aptronymic Edward Fink" was known in the Law Enforcement Community as a "Perenial informant" who frequently sought favors by claiming that Fellow inmates confessed to him while awaiting trial. the goverment aduquately Train or supperwise the prosecuters who worked for them and filed to establish a

System for sharing information about informer. see Monell v. Dept. of social Services 436 U.S. 658 (1978) Mcmillian v. Monroe County. 520 U.S. 781 (1997).

51- Plaintiff reallege and incorporate by reference all paragraphs 1-51.

### Defendant, John F. Campanella.

52- Defendant is a resident and citizen of the state of New york and FBI Agent, Addressed. 26, Federal plaza New york NY.

53- At all time relevant hereto. Defendant was acting within te Course and scope of His employment and under color of law.

54- Defendant violate 18, U.S.C. 1512, C, 2) knowingly and willfully lies in interrogatories Obstructed justice. and 18, U.S.C. 1515, a, d, A) opstruction of on official proceeding.

55- Defendant knowingly and willfully lied give unde oath folsified testimony in Frond of Grand jury Southern District of New york. see EXH-1,

56- Defendant under Coorperation knowingly and will fully give lie testimony under Oath in Court Room by trial jury and said I followed Ozsusamlar, after Recording Conversation with the C.W. bitwen manhattan and Brooklyn NY. See EXH. J.

57- Defendant clearly lie because plaintiff (Defendant) Ozsusamlar incarcreated Since Dec. 5, 2001. Never out from jail. see. EXH. J-A.

58- Defendant give under oath knowingly willfully lie testimony in Court Room to Trial jury under Coorperation defense attorney See EXH. N. and EXH. N-A.

59- Defendant knowingly and willfully give under oat folsified testimony. said I have C.W. named IGOR. Mr IGORS information and his releation ship with Ozsusamlar (mustafa) but IGOR Newer known who is mustafa. see EXH. O.

60- Defendant Campanella under coorperation with defense attorney feal free Lie in court room and frond of trial jury. in may 2002 Arrested plaintiff (Mustafa) searched mustafas car finded lath of Identification different than his See EXH-N-A. I am plaintiff mustafa Ozsusamlar. I was D.C. jail Dec. 05. 2001 How the Defendant Agent Campanella arrested me in manhatten New york. I do not have two life there is justice I looking to find. See EXH. N. A.

61- Defendant violated plaintiff Constitutional Rights. see. U.S. V. yermain 468 U.S. 63 (1984) in which the U.S. Supreme court held that the federal nature of a Crime need not be in the mind of the prepetrator 18, U.S.C. section 1001.

Applies to on who "knowingly and willfully" makes false statements to a federal Agency, Just as Section 88-c Applies to one who is knowingly and willfully Communicates a false distress message in Court. there is constitutional Rights Violated. Defendant under oath federal employee can not need to violate own Oath and proffesional responsibility and can not have a right to violate Plaintiff Ozsusamlar for terrorasing innocence person making criminal.

62-Plaintiff reallege and incorporate by reference all paragraphs 1-62.

## Defendant Mark Leeper.

63-Deffendant Mr. leeper was under oat a federal Agent. Mr. leeper case Agent in washington DC. Case No: 01-cr-466(EGS) Case transfered to New York 02-cr-763-(KMW) Mr. leeper under oath give falsified testimony in Court room D.C. And N.Y. Because D.C. And NY. Testimony clearly Contradicted each Others knowingly and willfully violating own proffesional responsibility and Plaintiffs Constitutional Rights.

64-Defendant under oath testimony in D.C. frond of Judge Sullivan. See EXH. K.

65-Defendant under oath testimony in NY-frond of Judge Wood. See EXH-KA.

66-Deffendant a teefh Agent stilled Plaintip $93-00 U.S. Corency. See EXH:K-B

67-At all time relevant hereto. Deffendant resident and united states citizen and Still working ICE Agent Homlant security I did not find his address.

68-At all time relevant hereto, defendant was acting within the course and scope Of his work under color of law.

69-Defendant violate plaintiff Constitutional Rights under coorperation with Another Defendant violating own under oath prefessional Responsibility.

70-Plaintiff reallege and incorporate by reference all paragraphs 1-70.

## Jurisdiction and venue.

71- this Court has Jurisdiction over this action pursuant to 28, U.S.C. 1331, and 1343 (a) Constitution of the united states.

72-Venue of this case is proper in the Southern District of New York to 28. U.S.C. Section 1391 (b), because a substantial part of the event or Omission giving rise to the claim accurred in this District of New York.

73-Plaintiff pray to Court and Justice giving a special order to Suspention Attorney B, Alan seidler and Alexander H. Southwell.

## Cause of Action.

74- Plaintiffs incorporate by reference each proceeding all paragraphs as tought Full at Lengh herein.

75- Plaintiff had seriously harrased by this defendents.

76 Plaintiff still seriously harrased by the goverment official prosecuter Office Employee and Agent Campanella using official power given to Order to B.O.P official for the ponishmen to plaintiff.

77- Defendant Conduct unusuable panishment to plaintiff.

78- Defendant Acted under color of law.

79- Plaintiff reallege and incorporate by reference all paragraphs 1-79.

## Prayer For Relief.

Wherefore, plaintiff prays for relief as fallows.

1- Compensatory damages including but not limited to non-Economic Damages in Excess of $75,000.00. for each defendant.

2- Punitive damages.

3- Attorney fees Expenses and coust of this action: and

4- Such Further relief as this Court deems proper.

## JURY DEMAND.

Plaintiff heraby demands a trial by jury on all issues to triable.

## Respectfully Submitted.

Date: june. 27. 2013.

Mustafa Ozsusamlar. 18188-050.
P.O. BOX-420. FCI-Fairton. NJ-08320.

## Certifiete of Service.

I mustafa Ozsusamlar. I have read the foregoing Complaint and hereby that the Matters alleged therein are true. except as to matters alleged on information And belief. and. as to those, I believe them to be true. I certify under penalty to Perjury that the foregoing is true and correct:

Date: june, 27, 2013.

Mustafa Ozsusamlar 18188-050.
P.O. BOX-420. FCI. Fairton. NJ. 08320

Pg-8-